# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br>a municipal corporation,<br>441 4th Street, N.W.<br>Washington, D.C. 20001<br><br>    Plaintiff,<br><br>          v.<br><br>GROUP HOSPITALIZATION AND MEDICAL<br>SERVICES, INC.,<br>840 First Street, N.E.<br>Washington, D.C. 20065<br><br>    and<br><br>CAREFIRST, INC.,<br>10455 Mill Run Circle<br>Owings Mills, MD 21117<br><br>    Defendants. | Case No:<br>Judge:<br><br>**NOTICE OF REMOVAL** |

## NOTICE OF REMOVAL

Defendants Group Hospitalization and Medical Services, Inc. ("GHMSI") and

CareFirst, Inc. ("CareFirst") respectfully notify this Court that, pursuant to 28 U.S.C. §§ 1331

and 1441(a)-(b), they have this day removed the civil action captioned as District of Columbia v.

Group Hospitalization and Medical Services, Inc. and CareFirst, Inc., Case No. 0004562-08,

from the Superior Court of the District of Columbia, Civil Division, Washington, D.C., to the

United States District Court for the District of Columbia. In support of this Notice of Removal,

Defendants state as follows:

## PRELIMINARY STATEMENT

1.      On June 24, 2008, Plaintiff District of Columbia filed its Complaint in the Superior Court of the District of Columbia, Civil Division, Washington, D.C., asserting claims against GHMSI and CareFirst.

2.      The Complaint was served on GHMSI and CareFirst on June 26, 2008. This Notice of Removal has been filed within thirty days of service of the Complaint on Defendants and accordingly is timely under 28 U.S.C. § 1446(b).

3.      This action is removable to this Court pursuant to 28 U.S.C. §§ 1441(a)-(b) & 1446(a) because the United States District Court for the District of Columbia embraces the location where the civil action is pending and Plaintiff's Complaint involves a substantial federal question.

4.      Pursuant to 28 U.S.C. § 1446(a), a true and accurate copy of the Complaint, with attached summons and exhibits, being all of the papers served upon GHMSI and CareFirst in this action, is attached hereto as Exhibit A.  No further proceedings have occurred in the above-referenced civil action.

5.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy of this Notice of Removal, along with a Notice of Notice of Removal, is being contemporaneously filed with the Superior Court for the District of Columbia.

## GROUNDS FOR REMOVAL

6.      The civil action Plaintiff filed in the Superior Court of the District of Columbia is one over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331, and it therefore may be removed to this Court under 28 U.S.C. § 1441(a)-(b).

\\\DC - 032924/000001 - 2756936 v1

7.      Section 1441(a) provides that, subject to certain exceptions not applicable here, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." See also 28 U.S.C. § 1441(b) (citizenship or residence of parties is not relevant when district court has original jurisdiction over claims asserted in complaint).

8.      United States District Courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331.

9.      A complaint bringing state-law claims is removable based on Sections 1331 and 1441 if those claims "implicate significant federal issues." Grable & Sons Metal Prods., Inc. v. Darue Assurance Eng'g Mfg., 545 U.S. 308, 312 (2005). "[A] federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." Id.; Greene v. American Fed'n of Gov't Employees, No. Civ. A. 05-0408 RMU, 2005 WL 3275903, at *2 (D.D.C. Sept. 7, 2005); Bobo v. Christus Health, 359 F. Supp. 2d 552, 556 (E.D. Tex. 2005) (denying motion to remand complaint raising state-law claims; plaintiff's right to relief depends on federal law if "the federal right or obligation, as incorporated within a state law claim or claims, is 'such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another'") (citation omitted).

10.     Plaintiff's claims necessarily present a substantial question of federal law: the interpretation of GHMSI's Congressional Charter. See Pub. L. No. 395, 53 Stat. 1412 (1939); Pub. L. No. 98-493, 98 Stat. 2272 (1984). Both of Plaintiff's claims depend on the meaning and

scope of GHMSI's federal Charter.  In Count I – framed as a claim for "Willful Violation of Charter" – Plaintiff alleges that GHMSI and CareFirst "willfully violated" GHMSI's federal Charter by "operating GHMSI for other than nonprofit purposes and contrary to its mission as a charitable and benevolent institution . . . ."  Compl. ¶ 28.  Plaintiff similarly alleges in Count II that GHMSI and CareFirst have breached an obligation allegedly defined by GHMSI's animating federal Charter "[b]y using GHMSI's assets inconsistently with its charitable purposes . . . ."  Id. ¶ 31.  See also Compl. ¶¶ 1 (alleging that GHMSI and CareFirst acted "contrary to GHMSI's legal obligations as a charitable and benevolent institution"), 7 (quoting GHMSI's Congressional Charter declaring GHMSI "to be a charitable and benevolent institution" that "shall not be conducted for profit, but shall be conducted for the benefit of [its] certificate holders"), 8 (alleging that "[u]nder the aforementioned Charter provisions . . . GHMSI [is required] to treat the promotion of public health as its bottom-line mission and to pursue business goals . . . solely as means of advancing this mission").

11.    Accordingly, Plaintiff's Complaint arises under the laws of the United States, as required by 28 U.S.C. § 1331, and is removable.

## CONCLUSION

12.    For all of the foregoing reasons, removal of this case to this Court is proper pursuant to 28 U.S.C. § 1441(a)-(b).

WHEREFORE, GHMSI and CareFirst, the Defendants in this action, pursuant to 28 U.S.C. § 1441 and in conformance with the requirements set forth in 28 U.S.C. § 1446 and the Rules of the United States District Court for the District of Columbia, remove this civil

\\\DC - 032924/000001 - 2756936 v1

action from the Superior Court of the District of Columbia, Civil Division, Washington, D.C., on

this 16th day of July, 2008.

Respectfully Submitted,

Dated: July 16, 2008                      By: *E. Desmond Hogan / by A.C.C.*

Craig A. Hoover, Esq. (D.C. Bar No. 386918)
E. Desmond Hogan (D.C. Bar No. 458044)
**HOGAN & HARTSON L.L.P.**
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Phone:  (202) 637-5600
Fax: (202) 637-5910
E-mail:  cahoover@hhlaw.com
E-mail:  edhogan@hhlaw.com

Attorneys for Defendants
Group Hospitalization and Medical Services, Inc.
and CareFirst, Inc.

\\\DC - 032924/000001 - 2756936 v1

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 16, 2008, a true and correct copy of the foregoing

Notice of Removal was served by first class U.S. mail, postage prepaid, and by Federal Express

overnight delivery, on:

       Peter J. Nickles
       George C. Valentine
       Ellen A. Efros
       Bennett Rushkoff

       Office of the Attorney General
       441 4th Street, N.W., Suite 1130-N
       Washington, D.C. 20001

       Attorneys for Plaintiff District of Columbia

*E. Desmond Hogan / by A.L.C.*

E. Desmond Hogan

\\\DC - 032924/000001 - 2756936 v1

# EXHIBIT A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DISTRICT OF COLUMBIA
Vs.                                              C.A. No.        2008 CA 004562 B
GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.,
### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge NATALIA COMBS GREENE
Date:   June 24, 2008
Initial Conference: 9:00 am, Friday, September 26, 2008
Location:   Courtroom 217
            500 Indiana Avenue N.W.
            WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

| DISTRICT OF COLUMBIA |
| --- |

*Plaintiff*

0004562-08

**VS.**

| CAREFIRST, INC. |
| --- |

Civil Action No. [                    ]

*Defendant*

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| Bennett Rushkoff |
| --- |
Name of Plaintiff's Attorney

| OAG, 441 4th Street, N.W., Suite 1130-N |
| --- |
Address

| Washington, DC 20001 |
| --- |

| 202-727-5173 |
| --- |
Telephone

By _____
Deputy Clerk

Date | June 24, 2008 |

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 98        **NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA Clerk's Office**
**CIVIL DIVISION**

**RECEIVED**

**JUN 2 4 2008**

Superior Court of the
District of Columbia
Washington, D.C.

DISTRICT OF COLUMBIA,                )
a municipal corporation,             )
441 4th Street, N.W.       )
Washington, DC  20001,               )
                                     )          Civil Action No.  0004562-08
         Plaintiff,                  )
                                     )
      v.                             )
                                     )
GROUP HOSPITALIZATION AND MEDICAL    )
SERVICES, INC.,                      )
840 First Street, N.E.               )
Washington, DC  20065,               )
                                     )
         and                         )
                                     )
CAREFIRST, INC.,                     )
10455 Mill Run Circle                )
Owings Mills, MD  21117,             )
                                     )
         Defendants.                 )


**COMPLAINT FOR DECLARATORY RELIEF,**
**ORDER OF REHABILITATION, AND OTHER EQUITABLE RELIEF**

Plaintiff, the District of Columbia (the "District"), by its Attorney General, alleges:

1.      The District files this Complaint against Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") and Defendant CareFirst, Inc. ("CareFirst") for declaratory relief, an order of rehabilitation, and other equitable relief to remedy actions by Defendants that are contrary to GHMSI's legal obligations as a charitable and benevolent institution. These actions include using GHMSI's revenues to build up a level of surplus that exceeds the level required for any legitimate charitable or nonprofit purpose. In this case, the Attorney General represents the public interest in GHMSI using

its revenues and surplus for nonprofit purposes and consistently with its charitable

mission to promote public health.

## Jurisdiction

2.    The Court has jurisdiction over the subject matter of this case pursuant to

D.C. Official Code § 11-921(a)(6) and § 31-1310.  The Court has personal jurisdiction

over GHMSI pursuant to D.C. Official Code § 13-422, and over CareFirst pursuant to

D.C. Official Code § 13-423(a)(1) and (a)(2).

## Parties

3.    The District, a municipal corporation empowered to sue and be sued, is the

local government for the territory constituting the permanent seat of the government of

the United States.  Plaintiff brings this action, through its Attorney General, pursuant to

the District's statutory authority to rehabilitate insurers, D.C. Official Code § 31-1310,

and the Attorney General's common law authority to enforce charitable trusts, *see* D.C.

Official Code § 44-601(5).

4.    GHMSI, a federally chartered, non-stock, non-profit corporation

headquartered and domiciled in the District of Columbia, is licensed and regulated by the

District as a Hospital and Medical Services Corporation under D.C. Code § 31-3501 *et*

*seq*.  *See* Pub. L. No. 103-127, §§ 138(a) and (b)(1), 107 Stat. 1336 (1993).  GHMSI's

primary business is selling health insurance and administering health plans in the District

of Columbia, as well as in Maryland and Northern Virginia.  The majority of premium

revenue generated by GHMSI is from its health insurance and health plan business in the

District of Columbia.

2

5.    CareFirst, a Maryland-based, non-profit holding company, is licensed and

regulated by the District as a Hospital and Medical Services Corporation under D.C.

Code § 31-3501 *et seq.* Since 1997 CareFirst has been the sole voting member of

GHMSI and, exercising both corporate control and contractual managerial authority, has

controlled and managed GHMSI's activities, including the activities that are the subject

of this Complaint. Both GHMSI and CareFirst currently do business as CareFirst

BlueCross BlueShield.

### GHMSI's Powers and Purpose

6.    Since 1984, GHMSI has been "authorized and empowered" by its Charter

> (a) to enter into contracts with individuals or groups of individuals to
> provide for hospitalization and medical care of such individuals, upon
> payment of specified rates or premiums, and to issue to such individuals
> appropriate certificates evidencing such contracts; (b) to enter into
> contracts with hospitals and other providers for the care and treatment of
> such individuals, in accordance with the terms of such certificates; (c) to
> cooperate, consolidate, or contract with individuals, groups, or
> organizations interested in promoting and safeguarding the public health;
> and (d) to engage in any lawful business that is incidental to or supportive
> of the business and affairs of this corporation.

Pub. L. No. 395, § 2, 53 Stat. 1412 (1939); Pub. L. 98-493, § 2, 98 Stat. 2272 (1984).

7.    At all times since its creation in 1939, GHMSI has been "declared" by its

Charter "to be a charitable and benevolent institution" that "shall not be conducted for

profit, but shall be conducted for the benefit of [its] certificate holders." Pub. L. No. 395,

§§ 3, 8, 53 Stat. 1412 (1939).

8.    Under the aforementioned Charter provisions, GHMSI's corporate

purpose is a charitable one: to promote public health, primarily through the provision of

nonprofit health plan services for the benefit of its certificate holders, *i.e.* subscribers.

This charitable purpose requires GHMSI to treat the promotion of public health as its

3

bottom-line mission and to pursue business goals – such as generation of operating

profits, enhancement of company value, accumulation and maintenance of surplus, and

compensation of executives – solely as means of advancing this mission.

### Defendants' Course of Conduct

9.    Soon after CareFirst assumed control of GHMSI in 1997, the pursuit of

profitable business and the building of asset value became GHMSI's bottom-line goals.

As the largest CareFirst affiliate, GHMSI was an integral part of CareFirst's 1999

Strategic Plan, which sought "Geographic Dominance by 2003 with revenue of $8 to $11

billion, market share of 3 times the next biggest competitor, and total capital of $1.5 to

$1.7 billion, at least $700 million of which is for acquisitions."

10.    As part of this plan, CareFirst sought to discontinue its role as "insurer of

last resort" and to shift its business from "unprofitable segments" to more profitable ones.

For example, during 2000-2001, when it was merging its for-profit health plan FreeState

into a GHMSI subsidiary, CareFirst decided that it needed to "re-underwrite" its

FreeState subscribers, which resulted in thousands of Maryland and District of Columbia

subscribers not qualifying for the new coverage due to health problems they had

developed while they were insured by FreeState.  Instead of offering these less-healthy

individuals coverage that was comparable to the HMO coverage they had as FreeState

subscribers, CareFirst offered them indemnity policies in an open-enrollment program

with high deductibles.

11.    CareFirst's focus on profits culminated in an unsuccessful attempt in

2002-2003 to convert itself and GHMSI, as well as GHMSI's affiliates, into for-profit

companies, which were to merge with the for-profit health insurer WellPoint Health

Networks, Inc. Although the primary stated rationale for the proposed for-profit

conversion was to provide CareFirst with improved access to capital needed for future

growth, CareFirst failed to give more than passing consideration to other growth

strategies – such as seeking to merge with another nonprofit health insurer – that would

have avoided the need to convert CareFirst and GHMSI into for-profit companies.

Indeed, in evaluating their options, CareFirst and GHMSI placed little or no value on

preserving their charitable and nonprofit status and missions, while giving special

attention to proposals that were likely to produce large payouts to CareFirst executives.

The attempted for-profit conversion was abandoned only after it was disapproved by the

Maryland Insurance Commissioner on March 5, 2003.

12.    Under CareFirst's management and control, GHMSI achieved dramatic

growth in capital without ever formally converting into a for-profit company. From 1998

to 2003, GHMSI's total adjusted risk-based capital – or "surplus" – increased each year,

growing from $159 million at year-end 1998 to $392 million by year-end 2003, and

reaching $501 million at year-end 2004.

13.    Based on a standard established by the National Association of Insurance

Commissioners, state insurance regulators typically expect an insurer to maintain a total

adjusted risk-based capital ("TAC") that is at least 200 percent of its authorized control

level ("ACL") risk-based capital. The Blue Cross and Blue Shield Association

("BCBSA") has set a more conservative standard, requiring a TAC risk-based capital that

is at least 375 percent of ACL. At year-end 2003, GHMSI's TAC risk-based capital was

equal to 787 percent of ACL – more than two times the BCBSA standard. At least by

that point, no legitimate charitable or non-profit purpose could have been served by

further increases to GHMSI's ratio of TAC risk-based capital to ACL. Yet, one year later, at year-end 2004, GHMSI's TAC risk-based capital had grown to 951 percent of ACL.

14.     As it pursued strategic growth in surplus that far exceeded whatever it might need to support its charitable, public benefit purposes, GHMSI disavowed even having a public benefit mission. In a legal analysis prepared by its counsel and submitted to the District's Department of Insurance, Securities and Banking on March 24, 2005, GHMSI stated that its "mission remains, as it has always been, to operate for the benefits [sic] of its subscribers, not for the benefit of the public at large."

### Defendants Are Urged to Return to Their Charitable and Nonprofit Purposes

15.     From early 2003 to late 2005, Defendants were repeatedly put on notice -- by two Maryland Insurance Commissioners, an independent public advocacy organization, the District's insurance regulators, and the District's Attorney General -- that they needed to change course and return to their charitable and nonprofit missions.

16.     Maryland Insurance Commissioner Steven B. Larsen, in a March 5, 2003 Report ("Larsen Report") accompanying and supporting his Order disapproving CareFirst's proposed for-profit conversion, set forth the following conclusions:

> From 1997 to the present, CareFirst management retreated from, and ultimately abandoned, its mission . . . and assumed all the operating characteristic[s] and corporate goals and mission of a for-profit company.

> The Board did not question the action by management to abandon the corporate mission and took no action to prevent it.

> Other regional nonprofit BlueCross/ BlueShield plans have succeeded financially and accumulated strong surplus levels and also continued to pursue a "public benefit mission" of serving vulnerable populations of insureds and subsidizing products to increase affordability.

> The Board took no action to determine how other nonprofit plans were able to continue as financially strong nonprofits while pursuing a public benefit mission [while] CareFirst management was abandoning its mission to provide insurance at least cost and expense.

Larsen Report at 111.

17.    Maryland Insurance Commissioner Alfred W. Redmer, Jr., in a July 8, 2003 Legislative Report ("Redmer Report") addressing whether the factual findings and legal conclusions in the Larsen Report supported "probable cause to believe" that statutory violations had occurred, concluded:

> [CareFirst's] withdrawal from markets that represent the most vulnerable and poorly served segments of the population and the lack of consideration of its nonprofit mission in adopting a strategic plan for the company make a prima facie case that the company was operated for profit.

Redmer Report at 36.  Noting that "the revocation or suspension of CareFirst's certificate of authority would serve no useful purpose and would be harmful to the public interest," Commissioner Redmer decided to issue an Order assessing a monetary penalty based on CareFirst having "embarked upon a declared course of corporate conduct that is in direct violation of a clear statutory mandate" not to be operated for profit. *Id.* at 37.

18.    The DC Appleseed Center for Law and Justice, an independent non-profit advocacy organization, issued a Report ("Appleseed Report") in December 2004 concluding that "GHMSI has not been meeting [its] charitable obligation to citizens of the National Capital area":

> [I]n order to meet its charitable obligation under its charter, GHMSI could and should be spending approximately $50 million currently and, in 2008, on the order of $100 million per year on community activities, and it is capable of doing so without evident risk to its competitive viability or its financial soundness. And yet . . . during 2004 it plans to spend only about $1 million in meeting that charitable obligation.

"CareFirst: Meeting Its Charitable Obligation to Citizens of the National Capital Area" at

I-10 (Dec. 2004). The Report's conclusions were supported by an attached legal analysis

prepared as a pro bono project by the law firm of Covington & Burling LLP and an

attached economic study prepared by the firm Mathematica Policy Research, Inc.

According to the economic study, even if GHMSI were to allocate two percent of its

gross premium revenue for community benefit programs from 2004 to 2008, its projected

surplus would likely continue at between two-and-a-half and four times the minimum

level that insurance regulators typically expect insurers to maintain. *Id.* at III-44, III-51.

19.     The District's Department of Insurance, Securities, and Banking issued a

Report ("DISB Report") on May 15, 2005, stating its belief that "[b]ased on its financial

health, including its significant surplus and net income level, and the breadth of its

operations in the District, . . . GHMSI should be engaging in charitable activity

significantly beyond its current activities." DISB Report at 19. After noting that there

was insufficient evidence in the record "to establish a maximum level of surplus" for

GHMSI, the Department concluded:

> Based on the evidence before the Department, it appears that GHMSI may
> reduce its surplus level without negatively impacting its financial strength
> and viability, and the Department believes that could be achieved by
> increasing financial contributions to organizations, activities, or joint
> efforts that will advance the public health in the District of Columbia.

*Id.* at 21.

20.     The Office of the Attorney General for the District of Columbia made

public, on or before October 3, 2005, two legal memoranda by the Attorney General

regarding GHMSI's "charitable obligation." The first Attorney General memorandum,

dated March 4, 2005, concluded, in part, that GHMSI "cannot fulfill [its charitable and

benevolent] mission simply by allocating a specified percentage of premiums or earnings to distinctly 'charitable' activities. Rather, GHMSI is to devote its entire operation to serving, directly or indirectly, the purposes for which it was chartered." Among the examples cited of "conduct that would appear to contravene GHMSI's charitable purposes" was "[s]eeking to increase GHMSI's profits or asset value without due regard for the effect on the quality, benefits, affordability, or accessibility of GHMSI's health plans." The memorandum also included examples of permissible uses of excess surplus, such as "[i]mproving the overall quality or benefits of its health plans for subscribers without increasing rates," "[i]ncreasing the accessibility of its health plans for new and existing subscribers by providing discounts for subscribers with limited income," and "[s]upporting the efforts of other charitable organizations to promote health in GHMSI's service area."

21.    The second Attorney General memorandum, dated August 4, 2005, clarified that a "charitable health insurer" like GHMSI "would be acting contrary to its charitable obligation if it made the accumulation of 'surplus' an end in itself, or sought to accumulate surplus for a purpose that was not reasonably related to the company's public health mission." The memorandum concluded that "[u]ntil GHMSI acknowledges its obligations as a 'charitable and benevolent institution' to operate for the benefit of the public, one cannot presume that its corporate decisions are based on a board determination as to how best to fulfill the corporation's charitable purposes."

### Defendants' Continued Focus on Profits and Surplus

22.     Rather than heeding regulators' warnings regarding the need to refocus its attention on charitable and nonprofit purposes, CareFirst has continued to make profit generation the most important factor in calculating financial incentives for its president and CEO. As of 2006, the president and CEO's annual incentive plan assigned 15 percent weights to both "net income" and "underwriting gain," and his long-term incentive plan relied on a combination of growth in the number of contracts and a measure of return on capital.

23.     Meanwhile, Defendants have still not acknowledged that GHMSI has an enforceable obligation, as a charitable and beneficial institution, to promote public health. In the fall of 2007, CareFirst's Interim President and CEO went so far as to state:

> The many meaningful investments CareFirst makes to improve the health of the residents of the Nation's Capital is [sic] not done out of any legal obligation to do so, but because we are committed to being a good corporate citizen and to fulfilling our mission to serve the community. Mandating financial targets for such voluntary good works conflicts with the tenets of [GHMSI's] Federal charter.

Letter from David D. Wolf to The Honorable Mary M. Cheh, D.C. Councilmember (Oct. 10, 2007).

24.     Despite being on notice that continuing to maintain an excessive surplus – at the expense of its service to the public – would be viewed by regulators and the public as inconsistent with its charitable mission, GHMSI continued during 2005-2007 to build its surplus, which reached $561 million at year-end 2005, $663 million at year-end 2006, and $754 million at year-end 2007. Moreover, GHMSI's ratio of TAC risk-based capital to ACL remained stubbornly high: 893 percent at year-end 2005, 955 percent at year-end 2006, and 916 percent at year-end 2007. Simply by holding the ratio of TAC risk-based

capital to ACL steady at the year-end 2003 level of 787 percent – which by year-end 2007 would have allowed a surplus of $648 million instead of the actual surplus of $754 million – GHMSI would have freed up more than $100 million in additional funding for the promotion of public health.

25.     In 2005 CareFirst launched its CareFirst Commitment Initiatives, which CareFirst claimed included $35 million in "rate relief" for GHMSI customers plus about $4 million in other benefits for the GHMSI service area. In each of the next two years, the CareFirst Commitment Initiatives – including initiatives unrelated to GHMSI – totaled about $9 million. By contrast, from year-end 2004 – when GHMSI's TAC risk-based capital was already at 951 percent of ACL – to year-end 2007, GHMSI's surplus grew by $252.5 million.

26.     Absent regulatory or judicial intervention compelling GHMSI to rededicate itself to nonprofit purposes and to its charitable mission of promoting public health, GHMSI is unlikely to cease building and maintaining its surplus at the expense of its obligations to serve the public.

## Count I

### (Willful Violation of Charter)

27.     The District repeats and realleges Paragraphs 1 through 26 as if set forth fully in this paragraph.

28.     Defendants have, within the previous four years, willfully violated GHMSI's charter by operating GHMSI for other than nonprofit purposes and contrary to its mission as a charitable and benevolent institution, providing grounds for rehabilitation pursuant to D.C. Official Code § 31-1310(9).

## Count II

### (Breach of Charitable Trust)

29.     The District repeats and realleges Paragraphs 1 through 26 as if set forth fully in this paragraph.

30.     As a charitable corporation, GHMSI's assets are subject under the common law to a charitable trust limiting their use to GHMSI's charitable purposes.

31.     By using GHMSI's assets inconsistently with its charitable purposes, Defendants are in breach of the charitable trust applicable to these assets.

### Prayer for Relief

WHEREFORE, the District requests that this Court:

a.      Declare that Defendants have violated GHMSI's charter and breached the charitable trust applicable to GHMSI's assets;

b.      Enjoin Defendants from further violations of GHMSI's charter and from further breaches of the charitable trust applicable to GHMSI's assets;

c.      Pursuant to D.C. Official Code § 31-1310(9), issue an order authorizing the Commissioner for the District's Department of Insurance Securities and Banking to rehabilitate GHMSI and rededicate the company's operations and surplus to nonprofit purposes and to its charitable, public health mission;

d.      Appoint a Special Master to assist the Court in overseeing the rehabilitation of GHMSI and the rededication of GHMSI's operations and surplus to nonprofit purposes and to its charitable, public health mission;

e.      Award the District its costs, including reasonable attorney's fees; and

f.      Order such other additional relief as the Court deems appropriate.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of
  Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


_Ellen A. Efros/BR_
ELLEN A. EFROS  (Bar #250746)
Assistant Deputy Attorney General
Civil Litigation Division


_Bennett Rushkoff_
BENNETT RUSHKOFF  (Bar #386925)
Senior Counsel for Public Advocacy
Consumer and Trade Protection Section
Office of the Attorney General
441 4th Street, N.W., Suite 1130-N
Washington, DC  20001
(202) 727-5173
bennett.rushkoff@dc.gov

Attorneys for the District of Columbia

Date:  June 24, 2008

**SCR CIV FORM 1-A**
Notice and Acknowledgment for Service by Mail
**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
Civil Division

District of Columbia
_Plaintiff_

V.

Civil Action Number  0004562-08

CareFirst, Inc.
_Defendant_

## NOTICE

To:   Name  John A. Picciotto, Esq., Executive V.P., General Counsel & Corp. Secy.

Address  CareFirst, Inc., 10455 Mill Run Circle, Owings Mills, MD  21117

The enclosed summons, complaint and initial order are served pursuant to Rule 4(c)(4) of the Superior Court Rules of Civil Procedure.

You must sign and date the Acknowledgement. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within twenty (20) days after it has been mailed, you (or the other party on whose behalf you are being served) may be required to pay any expenses incurred in serving a summons, complaint and initial order in any other manner permitted by law.

If you do complete and return this form, you (or the other party on whose behalf you are being served) must answer the complaint within twenty (20) days after you have signed, dated and returned the form. If you fail to do so, judgment by default may be taken against you or the relief demanded in the complaint.

This Notice and Acknowledgment of Receipt of Summons, Complaint and Initial Order was mailed on (insert date)  June 25, 2008

_Signature_                               Date of Signature  June 25, 2008

**Acknowledgment of Receipt of Summons, Complaint and Initial Order**

I received a copy of the summons, complaint and initial order in the above captioned matter at

(address)

Signature                    Relationship to Defedant/Authority    Date of Signature
                             _To Receive Service_

Form CV(6)-1590/Mar 97



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DISTRICT OF COLUMBIA
Vs.                                             C.A. No.        2008 CA 004562 B
GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.,
### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge NATALIA COMBS GREENE
Date:   June 24, 2008
Initial Conference: 9:00 am, Friday, September 26, 2008
Location:   Courtroom 217
                500 Indiana Avenue N.W.
                WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

ÇA Form 1

# 𝔖uperior 𝔠ourt of the 𝔇istrict of 𝔠olumbia
## CIVIL DIVISION
500  Indiana  Avenue,  N.W.,  Room  JM-170
Washington,   D.C.   20001   Telephone:   879-1133

| DISTRICT OF COLUMBIA | |
|---|---|

*Plaintiff*

**0004562-08**

VS.

| GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC. | |
|---|---|

Civil  Action  No. | |

*Defendant*

## SUMMONS

To  the  above  named  Defendant:

    You  are  hereby  summoned  and  required  to  serve  an  Answer  to  the  attached  Complaint,  either personally  or  through  an  attorney,  within  twenty  (20)  days  after  service  of  this  summons  upon  your exclusive  of  the  day  of  service.  If  you  are  being  sued  as  an  officer  or  agency  of  the  United  States Government  or  the  District  of  Columbia  Government  you  have  60  days  after  service  of  this  summons  to serve  your  Answer.  A  copy  of  the  Answer  must  be  mailed  to  the  attorney  for  the  party  plaintiff  who  is suing  you.  The  attorney's  name  and  address  appear  **below.**    If  plaintiff  has  no  attorney,  a  copy  of  the Answer  must  be  mailed  to  the  plaintiff  at  the  address  stated  on  this  Summons.

    You  are  also  required  to  file  the  original  Answer  with  the  Court  in  Room  JM  170  at  500  Indiana Avenue.  N.W.  between  9:00  am.  and  4:00  pm.,  Mondays  through  Fridays  or  between  9:00  am.  and 12:00  Noon  on  Saturdays.  You  may  file  the  original  Answer  with  the  Court  either  before  you  serve  a copy  of  the  Answer  on  the  plaintiff  or  within  five  (5)  days  after  you  have  served  the  plaintiff  If  you  fail to  file  an  Answer,  judgment  by  default  may  be  entered  against  you  for  the  relief  demanded  in  the complaint.

*Clerk of the Court*

| Bennett Rushkoff |
|---|
Name of Plaintiff's Attorney

| OAG, 441 4th Street, N.W., Suite 1130-N |
|---|
Address

| Washington, DC  20001 |
|---|

| 202-727-5173 |
|---|
Telephone

By _____
                 Deputy Clerk

Date | June 24, 2008 |

PUEDE  OBTENERSE  COPIAS  DE  ESTE FORMULARIO  EN  ESPANOL  EN  EL  TRIBUNAL  SUPERIOR  DEL DISTRITO  DE  COLUMBIA,  500  INDIANA  AVENUE,  N.W.,  SALA  JM  170

YOU  MAY  OBTAIN  A  COPY  OF  THIS   FORM  IN  SPANISH  AT  THE  SUPERIOR  COURT  OF  D.C.,  500  INDIANA AVENUE,  N.W.,  ROOM  JM  170

Form CV(6)-456/Mar. 98        **NOTE:**  SEE  IMPORTANT  INFORMATION  ON  BACK  OF  THIS  FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

RECEIVED
Civil Clerk's Office

JUN 2 4 2008

Superior Court of the
District of Columbia
Washington, D.C.

|  |  |
|---|---|
| DISTRICT OF COLUMBIA, <br> a municipal corporation, <br> 441 4th Street, N.W. <br> Washington, DC 20001, | ) <br> ) <br> ) <br> ) |
|  | ) |
|     Plaintiff, | ) <br> ) |
|  | ) |
|     v. | ) <br> ) |
|  | ) |
| GROUP HOSPITALIZATION AND MEDICAL <br> SERVICES, INC., <br> 840 First Street, N.E. <br> Washington, DC 20065, | ) <br> ) <br> ) <br> ) |
|  | ) |
|     and | ) <br> ) |
|  | ) |
| CAREFIRST, INC., <br> 10455 Mill Run Circle <br> Owings Mills, MD 21117, | ) <br> ) <br> ) |
|  | ) |
|     Defendants. | ) <br> ) |

Civil Action No.

0004552-08

0004562-08

**COMPLAINT FOR DECLARATORY RELIEF,**
**ORDER OF REHABILITATION, AND OTHER EQUITABLE RELIEF**

Plaintiff, the District of Columbia (the "District"), by its Attorney General, alleges:

1.    The District files this Complaint against Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") and Defendant CareFirst, Inc. ("CareFirst") for declaratory relief, an order of rehabilitation, and other equitable relief to remedy actions by Defendants that are contrary to GHMSI's legal obligations as a charitable and benevolent institution.  These actions include using GHMSI's revenues to build up a level of surplus that exceeds the level required for any legitimate charitable or nonprofit purpose.  In this case, the Attorney General represents the public interest in GHMSI using

its revenues and surplus for nonprofit purposes and consistently with its charitable
mission to promote public health.

## Jurisdiction

2.    The Court has jurisdiction over the subject matter of this case pursuant to
D.C. Official Code § 11-921(a)(6) and § 31-1310.  The Court has personal jurisdiction
over GHMSI pursuant to D.C. Official Code § 13-422, and over CareFirst pursuant to
D.C. Official Code § 13-423(a)(1) and (a)(2).

## Parties

3.    The District, a municipal corporation empowered to sue and be sued, is the
local government for the territory constituting the permanent seat of the government of
the United States.  Plaintiff brings this action, through its Attorney General, pursuant to
the District's statutory authority to rehabilitate insurers, D.C. Official Code § 31-1310,
and the Attorney General's common law authority to enforce charitable trusts, *see* D.C.
Official Code § 44-601(5).

4.    GHMSI, a federally chartered, non-stock, non-profit corporation
headquartered and domiciled in the District of Columbia, is licensed and regulated by the
District as a Hospital and Medical Services Corporation under D.C. Code § 31-3501 *et*
*seq.*  *See* Pub. L. No. 103-127, §§ 138(a) and (b)(1), 107 Stat. 1336 (1993).  GHMSI's
primary business is selling health insurance and administering health plans in the District
of Columbia, as well as in Maryland and Northern Virginia.  The majority of premium
revenue generated by GHMSI is from its health insurance and health plan business in the
District of Columbia.

5.    CareFirst, a Maryland-based, non-profit holding company, is licensed and

regulated by the District as a Hospital and Medical Services Corporation under D.C.

Code § 31-3501 *et seq.* Since 1997 CareFirst has been the sole voting member of

GHMSI and, exercising both corporate control and contractual managerial authority, has

controlled and managed GHMSI's activities, including the activities that are the subject

of this Complaint. Both GHMSI and CareFirst currently do business as CareFirst

BlueCross BlueShield.

### GHMSI's Powers and Purpose

6.    Since 1984, GHMSI has been "authorized and empowered" by its Charter

(a) to enter into contracts with individuals or groups of individuals to
provide for hospitalization and medical care of such individuals, upon
payment of specified rates or premiums, and to issue to such individuals
appropriate certificates evidencing such contracts; (b) to enter into
contracts with hospitals and other providers for the care and treatment of
such individuals, in accordance with the terms of such certificates; (c) to
cooperate, consolidate, or contract with individuals, groups, or
organizations interested in promoting and safeguarding the public health;
and (d) to engage in any lawful business that is incidental to or supportive
of the business and affairs of this corporation.

Pub. L. No. 395, § 2, 53 Stat. 1412 (1939); Pub. L. 98-493, § 2, 98 Stat. 2272 (1984).

7.    At all times since its creation in 1939, GHMSI has been "declared" by its

Charter "to be a charitable and benevolent institution" that "shall not be conducted for

profit, but shall be conducted for the benefit of [its] certificate holders." Pub. L. No. 395,

§§ 3, 8, 53 Stat. 1412 (1939).

8.    Under the aforementioned Charter provisions, GHMSI's corporate

purpose is a charitable one: to promote public health, primarily through the provision of

nonprofit health plan services for the benefit of its certificate holders, *i.e.* subscribers.

This charitable purpose requires GHMSI to treat the promotion of public health as its

bottom-line mission and to pursue business goals – such as generation of operating

profits, enhancement of company value, accumulation and maintenance of surplus, and

compensation of executives – solely as means of advancing this mission.

### Defendants' Course of Conduct

9.      Soon after CareFirst assumed control of GHMSI in 1997, the pursuit of

profitable business and the building of asset value became GHMSI's bottom-line goals.

As the largest CareFirst affiliate, GHMSI was an integral part of CareFirst's 1999

Strategic Plan, which sought "Geographic Dominance by 2003 with revenue of $8 to $11

billion, market share of 3 times the next biggest competitor, and total capital of $1.5 to

$1.7 billion, at least $700 million of which is for acquisitions."

10.     As part of this plan, CareFirst sought to discontinue its role as "insurer of

last resort" and to shift its business from "unprofitable segments" to more profitable ones.

For example, during 2000-2001, when it was merging its for-profit health plan FreeState

into a GHMSI subsidiary, CareFirst decided that it needed to "re-underwrite" its

FreeState subscribers, which resulted in thousands of Maryland and District of Columbia

subscribers not qualifying for the new coverage due to health problems they had

developed while they were insured by FreeState. Instead of offering these less-healthy

individuals coverage that was comparable to the HMO coverage they had as FreeState

subscribers, CareFirst offered them indemnity policies in an open-enrollment program

with high deductibles.

11.     CareFirst's focus on profits culminated in an unsuccessful attempt in

2002-2003 to convert itself and GHMSI, as well as GHMSI's affiliates, into for-profit

companies, which were to merge with the for-profit health insurer WellPoint Health

4

Networks, Inc. Although the primary stated rationale for the proposed for-profit

conversion was to provide CareFirst with improved access to capital needed for future

growth, CareFirst failed to give more than passing consideration to other growth

strategies – such as seeking to merge with another nonprofit health insurer – that would

have avoided the need to convert CareFirst and GHMSI into for-profit companies.

Indeed, in evaluating their options, CareFirst and GHMSI placed little or no value on

preserving their charitable and nonprofit status and missions, while giving special

attention to proposals that were likely to produce large payouts to CareFirst executives.

The attempted for-profit conversion was abandoned only after it was disapproved by the

Maryland Insurance Commissioner on March 5, 2003.

    12.    Under CareFirst's management and control, GHMSI achieved dramatic

growth in capital without ever formally converting into a for-profit company. From 1998

to 2003, GHMSI's total adjusted risk-based capital – or "surplus" – increased each year,

growing from $159 million at year-end 1998 to $392 million by year-end 2003, and

reaching $501 million at year-end 2004.

    13.    Based on a standard established by the National Association of Insurance

Commissioners, state insurance regulators typically expect an insurer to maintain a total

adjusted risk-based capital ("TAC") that is at least 200 percent of its authorized control

level ("ACL") risk-based capital. The Blue Cross and Blue Shield Association

("BCBSA") has set a more conservative standard, requiring a TAC risk-based capital that

is at least 375 percent of ACL. At year-end 2003, GHMSI's TAC risk-based capital was

equal to 787 percent of ACL – more than two times the BCBSA standard. At least by

that point, no legitimate charitable or non-profit purpose could have been served by

further increases to GHMSI's ratio of TAC risk-based capital to ACL. Yet, one year later, at year-end 2004, GHMSI's TAC risk-based capital had grown to 951 percent of ACL.

14.    As it pursued strategic growth in surplus that far exceeded whatever it might need to support its charitable, public benefit purposes, GHMSI disavowed even having a public benefit mission. In a legal analysis prepared by its counsel and submitted to the District's Department of Insurance, Securities and Banking on March 24, 2005, GHMSI stated that its "mission remains, as it has always been, to operate for the benefits [sic] of its subscribers, not for the benefit of the public at large."

### Defendants Are Urged to Return to Their Charitable and Nonprofit Purposes

15.    From early 2003 to late 2005, Defendants were repeatedly put on notice – by two Maryland Insurance Commissioners, an independent public advocacy organization, the District's insurance regulators, and the District's Attorney General – that they needed to change course and return to their charitable and nonprofit missions.

16.    Maryland Insurance Commissioner Steven B. Larsen, in a March 5, 2003 Report ("Larsen Report") accompanying and supporting his Order disapproving CareFirst's proposed for-profit conversion, set forth the following conclusions:

> From 1997 to the present, CareFirst management retreated from, and ultimately abandoned, its mission . . . and assumed all the operating characteristic[s] and corporate goals and mission of a for-profit company.

> The Board did not question the action by management to abandon the corporate mission and took no action to prevent it.

> Other regional nonprofit BlueCross/ BlueShield plans have succeeded financially and accumulated strong surplus levels and also continued to pursue a "public benefit mission" of serving vulnerable populations of insureds and subsidizing products to increase affordability.

The Board took no action to determine how other nonprofit plans were able to continue as financially strong nonprofits while pursuing a public benefit mission [while] CareFirst management was abandoning its mission to provide insurance at least cost and expense.

Larsen Report at 111.

17.    Maryland Insurance Commissioner Alfred W. Redmer, Jr., in a July 8, 2003 Legislative Report ("Redmer Report") addressing whether the factual findings and legal conclusions in the Larsen Report supported "probable cause to believe" that statutory violations had occurred, concluded:

[CareFirst's] withdrawal from markets that represent the most vulnerable and poorly served segments of the population and the lack of consideration of its nonprofit mission in adopting a strategic plan for the company make a prima facie case that the company was operated for profit.

Redmer Report at 36. Noting that "the revocation or suspension of CareFirst's certificate of authority would serve no useful purpose and would be harmful to the public interest," Commissioner Redmer decided to issue an Order assessing a monetary penalty based on CareFirst having "embarked upon a declared course of corporate conduct that is in direct violation of a clear statutory mandate" not to be operated for profit. *Id.* at 37.

18.    The DC Appleseed Center for Law and Justice, an independent non-profit advocacy organization, issued a Report ("Appleseed Report") in December 2004 concluding that "GHMSI has not been meeting [its] charitable obligation to citizens of the National Capital area":

[I]n order to meet its charitable obligation under its charter, GHMSI could and should be spending approximately $50 million currently and, in 2008, on the order of $100 million per year on community activities, and it is capable of doing so without evident risk to its competitive viability or its financial soundness. And yet . . . during 2004 it plans to spend only about $1 million in meeting that charitable obligation.

"CareFirst: Meeting Its Charitable Obligation to Citizens of the National Capital Area" at
I-10 (Dec. 2004). The Report's conclusions were supported by an attached legal analysis
prepared as a pro bono project by the law firm of Covington & Burling LLP and an
attached economic study prepared by the firm Mathematica Policy Research, Inc.
According to the economic study, even if GHMSI were to allocate two percent of its
gross premium revenue for community benefit programs from 2004 to 2008, its projected
surplus would likely continue at between two-and-a-half and four times the minimum
level that insurance regulators typically expect insurers to maintain. *Id.* at III-44, III-51.

19.    The District's Department of Insurance, Securities, and Banking issued a
Report ("DISB Report") on May 15, 2005, stating its belief that "[b]ased on its financial
health, including its significant surplus and net income level, and the breadth of its
operations in the District, . . . GHMSI should be engaging in charitable activity
significantly beyond its current activities." DISB Report at 19. After noting that there
was insufficient evidence in the record "to establish a maximum level of surplus" for
GHMSI, the Department concluded:

> Based on the evidence before the Department, it appears that GHMSI may
> reduce its surplus level without negatively impacting its financial strength
> and viability, and the Department believes that could be achieved by
> increasing financial contributions to organizations, activities, or joint
> efforts that will advance the public health in the District of Columbia.

*Id.* at 21.

20.    The Office of the Attorney General for the District of Columbia made
public, on or before October 3, 2005, two legal memoranda by the Attorney General
regarding GHMSI's "charitable obligation." The first Attorney General memorandum,
dated March 4, 2005, concluded, in part, that GHMSI "cannot fulfill [its charitable and

benevolent] mission simply by allocating a specified percentage of premiums or earnings to distinctly 'charitable' activities. Rather, GHMSI is to devote its entire operation to serving, directly or indirectly, the purposes for which it was chartered." Among the examples cited of "conduct that would appear to contravene GHMSI's charitable purposes" was "[s]eeking to increase GHMSI's profits or asset value without due regard for the effect on the quality, benefits, affordability, or accessibility of GHMSI's health plans." The memorandum also included examples of permissible uses of excess surplus, such as "[i]mproving the overall quality or benefits of its health plans for subscribers without increasing rates," "[i]ncreasing the accessibility of its health plans for new and existing subscribers by providing discounts for subscribers with limited income," and "[s]upporting the efforts of other charitable organizations to promote health in GHMSI's service area."

21.    The second Attorney General memorandum, dated August 4, 2005, clarified that a "charitable health insurer" like GHMSI "would be acting contrary to its charitable obligation if it made the accumulation of 'surplus' an end in itself, or sought to accumulate surplus for a purpose that was not reasonably related to the company's public health mission." The memorandum concluded that "[u]ntil GHMSI acknowledges its obligations as a 'charitable and benevolent institution' to operate for the benefit of the public, one cannot presume that its corporate decisions are based on a board determination as to how best to fulfill the corporation's charitable purposes."

### Defendants' Continued Focus on Profits and Surplus

22.     Rather than heeding regulators' warnings regarding the need to refocus its attention on charitable and nonprofit purposes, CareFirst has continued to make profit generation the most important factor in calculating financial incentives for its president and CEO. As of 2006, the president and CEO's annual incentive plan assigned 15 percent weights to both "net income" and "underwriting gain," and his long-term incentive plan relied on a combination of growth in the number of contracts and a measure of return on capital.

23.     Meanwhile, Defendants have still not acknowledged that GHMSI has an enforceable obligation, as a charitable and beneficial institution, to promote public health. In the fall of 2007, CareFirst's Interim President and CEO went so far as to state:

> The many meaningful investments CareFirst makes to improve the health of the residents of the Nation's Capital is [sic] not done out of any legal obligation to do so, but because we are committed to being a good corporate citizen and to fulfilling our mission to serve the community. Mandating financial targets for such voluntary good works conflicts with the tenets of [GHMSI's] Federal charter.

Letter from David D. Wolf to The Honorable Mary M. Cheh, D.C. Councilmember (Oct. 10, 2007).

24.     Despite being on notice that continuing to maintain an excessive surplus – at the expense of its service to the public – would be viewed by regulators and the public as inconsistent with its charitable mission, GHMSI continued during 2005-2007 to build its surplus, which reached $561 million at year-end 2005, $663 million at year-end 2006, and $754 million at year-end 2007. Moreover, GHMSI's ratio of TAC risk-based capital to ACL remained stubbornly high: 893 percent at year-end 2005, 955 percent at year-end 2006, and 916 percent at year-end 2007. Simply by holding the ratio of TAC risk-based

capital to ACL steady at the year-end 2003 level of 787 percent – which by year-end

2007 would have allowed a surplus of $648 million instead of the actual surplus of $754

million – GHMSI would have freed up more than $100 million in additional funding for

the promotion of public health.

25.     In 2005 CareFirst launched its CareFirst Commitment Initiatives, which

CareFirst claimed included $35 million in "rate relief" for GHMSI customers plus about

$4 million in other benefits for the GHMSI service area.  In each of the next two years,

the CareFirst Commitment Initiatives – including initiatives unrelated to GHMSI –

totaled about $9 million.  By contrast, from year-end 2004 -- when GHMSI's TAC risk-

based capital was already at 951 percent of ACL – to year-end 2007, GHMSI's surplus

grew by $252.5 million.

26.     Absent regulatory or judicial intervention compelling GHMSI to

rededicate itself to nonprofit purposes and to its charitable mission of promoting public

health, GHMSI is unlikely to cease building and maintaining its surplus at the expense of

its obligations to serve the public.

### <u>Count I</u>

#### (Willful Violation of Charter)

27.     The District repeats and realleges Paragraphs 1 through 26 as if set forth

fully in this paragraph.

28.     Defendants have, within the previous four years, willfully violated

GHMSI's charter by operating GHMSI for other than nonprofit purposes and contrary to

its mission as a charitable and benevolent institution, providing grounds for rehabilitation

pursuant to D.C. Official Code § 31-1310(9).

## Count II

(Breach of Charitable Trust)

29.     The District repeats and realleges Paragraphs 1 through 26 as if set forth fully in this paragraph.

30.     As a charitable corporation, GHMSI's assets are subject under the common law to a charitable trust limiting their use to GHMSI's charitable purposes.

31.     By using GHMSI's assets inconsistently with its charitable purposes, Defendants are in breach of the charitable trust applicable to these assets.

## Prayer for Relief

WHEREFORE, the District requests that this Court:

a.      Declare that Defendants have violated GHMSI's charter and breached the charitable trust applicable to GHMSI's assets;

b.      Enjoin Defendants from further violations of GHMSI's charter and from further breaches of the charitable trust applicable to GHMSI's assets;

c.      Pursuant to D.C. Official Code § 31-1310(9), issue an order authorizing the Commissioner for the District's Department of Insurance Securities and Banking to rehabilitate GHMSI and rededicate the company's operations and surplus to nonprofit purposes and to its charitable, public health mission;

d.      Appoint a Special Master to assist the Court in overseeing the rehabilitation of GHMSI and the rededication of GHMSI's operations and surplus to nonprofit purposes and to its charitable, public health mission;

e.      Award the District its costs, including reasonable attorney's fees; and

f.      Order such other additional relief as the Court deems appropriate.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of
  Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


_Ellen A. Efros/BR_
ELLEN A. EFROS  (Bar #250746)
Assistant Deputy Attorney General
Civil Litigation Division


_Bennett Rushkoff_
BENNETT RUSHKOFF  (Bar #386925)
Senior Counsel for Public Advocacy
Consumer and Trade Protection Section
Office of the Attorney General
441 4th Street, N.W., Suite 1130-N
Washington, DC  20001
(202) 727-5173
bennett.rushkoff@dc.gov

Attorneys for the District of Columbia

Date: June 24, 2008

13

SCR CIV FORM 1-A

Notice and Acknowledgment for Service by Mail

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

Civil Division

District of Columbia
                                          *Plaintiff*

V.

Civil Action Number | 0004562-08

Group Hospitalization & Medical Services, Inc.
                                          *Defendant*

## NOTICE

To:    Name | John A. Picciotto, Esq., Executive V.P., General Counsel & Corp. Secy.

Address | Group Hospitalization and Medical Services, Inc.,

c/o CareFirst, Inc., 10455 Mill Run Circle, Owings Mills, MD 21117

The enclosed summons, complaint and initial order are served pursuant to Rule 4(c)(4) of the Superior Court Rules of Civil Procedure.

You must sign and date the Acknowledgement. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within twenty (20) days after it has been mailed, you (or the other party on whose behalf you are being served) may be required to pay any expenses incurred in serving a summons, complaint and initial order in any other manner permitted by law.

If you do complete and return this form, you (or the other party on whose behalf you are being served) must answer the complaint within twenty (20) days after you have signed, dated and returned the form. If you fail to do so, judgment by default may be taken against you or the relief demanded in the complaint.

This Notice and Acknowledgment of Receipt of Summons, Complaint and Initial Order was mailed on
**(insert date)** | June 25, 2008

_B tt Rushloff_                          | June 25, 2008
*Signature*                              | *Date of Signature*

### Acknowledgment of Receipt of Summons, Complaint and Initial Order

I received a copy of the summons, complaint and initial order in the above captioned matter at

**(address)** |

Signature                    | Relationship to Defedant/Authority | Date of Signature
                             | *To Receive Service*

Form CV(6)-1590/Mar 97

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

E
08-1218
ESH

## I (a) PLAINTIFFS

District of Columbia

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   D.C.
(EXCEPT IN U.S. PLAINTIFF CASES)

11101

### DEFENDANTS

Group Hospitalization & Medical Services

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   D.C.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Office of the Attorney General
Hosana Hof  441 4th St NW Suite 1130?
Washington, DC 20001

Case: 1:08-cv-01218
Assigned To : Huvelle, Ellen S.
Assign. Date : 7/16/2008
Description: General Civil

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)   FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act


B

| □ **G.** *Habeas Corpus/* **2255** | □ **H.** *Employment* *Discrimination* | □ **I.** *FOIA/PRIVACY* *ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| □ **530 Habeas Corpus-General** □ **510 Motion/Vacate Sentence** | □ **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)** *(If pro se, select this deck)** | □ **895 Freedom of Information Act** □ **890 Other Statutory Actions (if Privacy Act)** *(If pro se, select this deck)** | □ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| □ **K.** *Labor/ERISA* *(non-employment)* | □ **L.** *Other Civil Rights* *(non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
|---|---|---|---|
| □ **710 Fair Labor Standards Act** □ **720 Labor/Mgmt. Relations** □ **730 Labor/Mgmt. Reporting & Disclosure Act** □ **740 Labor Railway Act** □ **790 Other Labor Litigation** □ **791 Empl. Ret. Inc. Security Act** | □ **441 Voting (if not Voting Rights Act)** □ **443 Housing/Accommodations** □ **444 Welfare** □ **440 Other Civil Rights** □ **445 American w/Disabilities-Employment** □ **446 Americans w/Disabilities-Other** | □ **110 Insurance** □ **120 Marine** □ **130 Miller Act** □ **140 Negotiable Instrument** □ **150 Recovery of Overpayment & Enforcement of Judgment** □ **153 Recovery of Overpayment of Veteran's Benefits** □ **160 Stockholder's Suits** □ **190 Other Contracts** □ **195 Contract Product Liability** □ **196 Franchise** | □ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**
□ 1 Original Proceeding   (X) 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify)   □ Multi district Litigation   □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. §§ 1331 + 1441 (a)-(b)

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS □   ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint **JURY DEMAND:** □ YES (X) NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   □ YES   □ NO   If yes, please complete related case form.

**DATE** 7/16/08    **SIGNATURE OF ATTORNEY OF RECORD**    *Wm. Hogan by* ___ *(Amy Collen)*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.