## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br>    Plaintiff,<br><br>                              v.<br><br>GROUP HOSPITALIZATION AND MEDICAL,<br>SERVICES, INC., et al.,<br>    Defendants. | Case No: 1:08-cv-01218<br>Judge Ellen S. Huvelle<br><br>**RESPONSE TO COURT'S**<br>**JULY 21, 2008 ORDER** |

### DEFENDANTS' RESPONSE TO COURT'S JULY 21, 2008 ORDER

Defendants Group Hospitalization and Medical Services, Inc. ("GHMSI") and CareFirst, Inc. ("CareFirst") hereby respond to the Court's July 21, 2008 Order requesting a submission on why this case presents a "substantial question of federal law" sufficing to create federal-question jurisdiction. Order (July 21, 2008).

GHMSI is an interstate non-profit corporation with more than one million certificateholders who live and work in the District, Maryland, and Northern Virginia. It was created by Congressional charter in 1939. That federal charter sets forth GHMSI's corporate structure and purpose, and Congress in the past decades has seen fit several times to modify it. The Attorney General's two-count Complaint alleges that GHMSI and CareFirst "willfully" violated GHMSI's federal charter, and that GHMSI and CareFirst breached their purported charitable "trust" obligations under that charter.

Federal-question jurisdiction exists here because the Complaint depends on and is driven by plaintiff's interpretation of GHMSI's federal charter – an interpretation GHMSI and CareFirst vigorously dispute. The federal question presented, moreover, is "a nearly pure issue of law" that "c[an] be settled once and for all" by this Court. Empire Healthchoice Assurance, Inc.

v. McVeigh, 547 U.S. 677, 700 (2006) (quoting Richard H. Fallon, Jr., Daniel J. Meltzer &

David L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 65 (5th ed.,

2005 Supp.)) ("Hart & Wechsler") (quotation marks omitted).  And the dispute is an important

one.  It is not merely about the interpretation of a federal statutory provision; it pertains to the

fundamental Congressionally-dictated attributes and obligations of an entity – GHMSI – that

itself is a creature of federal law.  The Complaint therefore easily meets the federal-jurisdiction

test recently enunciated by the Supreme Court:  It "necessarily raise[s] a stated federal issue,

actually disputed and substantial, which [this] federal forum may entertain without disturbing

any congressionally approved balance of federal and state judicial responsibilities."  Grable &

Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  Empire – the case cited in

this Court's Order – is not to the contrary.  Empire reaffirmed the Grable test; the Empire Court

simply concluded that the federal connection to that case was too tangential, and thus not

sufficiently "substantial," to warrant federal jurisdiction.  As we demonstrate below, that is not

the case here; and accordingly, the Complaint was properly removed.

## STATEMENT OF FACTS

### A. GHMSI and CareFirst

GHMSI came into being in 1934, when a Washington, D.C. hospital association formed

Group Hospitalization, Inc.  See Ex. 1 (May 15, 2005, Ins. Comm'r Rep.); see also CareFirst

History and Timeline, available at www.carefirst.com/company/html/Timeline.html.  In 1939,

GHMSI (then GHI) was constituted as a not-for-profit corporation by Congressional charter.  See

Pub. L. No. 76-395, 53 Stat. 1412 (1939) (attached as Ex. 2).[1]  GHMSI's federal charter specifies

that the corporation therein constituted is

> authorized and empowered (a) to enter into contracts with individuals or groups of individuals to provide for hospitalization of such individuals, upon payment of specified rates or premiums, and to issue to such individuals appropriate certificates evidencing such contracts; (b) to enter into contracts with hospitals for the care and treatment of such individuals, in accordance with the terms of such certificates; (c) to cooperate, consolidate, or contract with groups or organizations interested in promoting and safeguarding the public health; and (d) to engage in any lawful business that is incidental to or supportive of the business and affairs of this corporation. [Id. § 2.]

Section 3 of GHMSI's federal charter states that the corporation "shall not be conducted for

profit, but shall be conducted for the benefit of the aforesaid certificate holders." Id. § 3.

Section 8 declared GHMSI to be a "charitable and benevolent institution, and all of its funds and

property shall be exempt from taxation other than taxes on real estate." Id. § 8.

Congress has amended GHMSI's federal charter several times since 1939. See id. § 11

("This Act may be altered, amended, or repealed at the pleasure of the Congress"); Pub. L. No.

105-149, 111 Stat. 2684 (1997) (this, GHMSI's current Congressional charter, is attached as Ex.

3); Pub. L. No. 103-127, 107 Stat. 1336 (1993); Pub. L. No. 98-493, 98 Stat. 2272 (1984).  And

in 1986, GHMSI – and other Blue Cross and Blue Shield entities – were stripped of their tax

exempt status for federal taxes by another Congressional enactment. See 26 U.S.C. § 501(m)(1);

26 U.S.C. § 833(a)(1).

**B.**    **The Attorney General's Memoranda and the Commissioner's Report**

**The Attorney General's First Memorandum.**  In December 2004, the D.C. Appleseed

Center for Law and Justice, a Washington advocacy group, published an article it had

---

[1]    In 1984, GHI merged with Medical Services of the District of Columbia, which administered the Blue Shield Plan in the Washington, D.C. area, to create GHMSI.  Congress thereafter amended GHMSI's charter, expanding the new company's purpose to include arranging for the provision of medical services. See Pub. L. No. 98-493, 98 Stat. 2272 (1984).

commissioned regarding what Appleseed characterized as GHMSI's "charitable obligations" to the District of Columbia at large. See Ex. 1 at 4-5 (May 15, 2005, Ins. Comm'r Rep.). The Appleseed article prompted the City Administrator to request from the Attorney General of the District of Columbia a memorandum evaluating Appleseed's "legal contentions" regarding GHMSI's obligations under its federal charter. Ex. 4 at 1 (Mar. 4, 2005, Mem. from Robert J. Spagnoletti, Attorney Gen., to Robert Bobb, City Adm'r). The Attorney General's memorandum concluded that Appleseed had overread GHMSI's obligations under its federal charter. Appleseed had contended that GHMSI had a " 'current, charitable' " obligation to " 'use its assets for the benefit of the public beyond its policyholders.' " Id. at 4. But as the Attorney General pointed out, GHMSI's purpose was "determined by its congressional charter" – and the charter's express directive was to "operate for the benefit of its subscribers." Id. at 1 (emphasis added); see id. at 4 (noting that GHMSI's "charter requires" that it "conduct[ ] itself for the benefit of its subscribers"). The memorandum accordingly concluded that GHMSI may appropriately fulfill its obligations under its federal charter "through the provision of health plan services to paying subscribers, and that GHMSI has no obligation to divert the profits generated by its health plan services to other charitable activities." Id. at 6. The Attorney General also observed that it was "largely up to GHMSI's board to decide how GHMSI will serve" the purpose articulated in its Congressional charter. Id. at 2; see also id. at 7.

**The Insurance Commissioner's Report.** In mid-May 2005, after an extensive public hearing, the Department of Insurance, Securities, and Banking issued findings as to GHMSI's "legal obligation to engage in charitable activities." Ex. 1 (May 15, 2005, Ins. Comm'r Rep.) (hereinafter the "Commissioner's Report"). The Commissioner's Report found "unpersuasive Appleseed's argument that GHMSI has a charitable obligation to the public at large." Id. at 9.

Rather, GHMSI "may satisfy the charitable obligation under its charter solely by providing health insurance in its service area." Id. at 10. The Commissioner's Report concluded with an express finding based on GHMSI's Congressional charter that GHMSI "may meet its legal obligation to engage in charitable activity solely through the provision of health insurance in its service area." Id. at 22.[2]

### C.    The Complaint

Three years passed. GHMSI continued to serve its certificate holders and to devote considerable resources to the District's community. Then, in June 2008, GHMSI and CareFirst were served with a document styled as a "Complaint For Declaratory Relief, Order Of Rehabilitation, And Other Equitable Relief." Brought by the District of Columbia by and through its Attorney General, the Complaint seeks, among other things, to remedy what the Complaint characterizes as "actions . . . contrary to GHMSI's legal obligations" under its federal charter. Id. ¶ 1. The Complaint contains two claims. Count I alleges that CareFirst and GHMSI "willfully violated" GHMSI's federal charter, which purported violation provides grounds for "rehabilitation" of GHMSI under D.C. Code § 31-1310(9). Complaint ¶ 28. Count II alleges that CareFirst and GHMSI used GHMSI's assets "inconsistently with [GHMSI's] charitable purposes," which constituted a "breach of the charitable trust applicable to these assets." Id. ¶¶ 30, 31.

The Complaint's prayer for relief seeks, among other things, a declaration that CareFirst and GHMSI have violated GHMSI's federal charter and breached the charitable "trust"

---

[2]    In August 2005, following the issuance of the Commissioner's Report, the Attorney General of the District of Columbia submitted a second memorandum to the City Administrator reiterating the conclusion reached in his first memorandum and stating that the Attorney General's Office would take no position on CareFirst's legal obligations beyond its duties to its policyholders as specified in its Congressional charter. Ex. 5 at 1 (Aug. 3, 2005 Mem. from Robert J. Spagnoletti, Attorney Gen., to Robert C. Bobb, City Adm'r).

5

purportedly created by the federal charter; an order authorizing the Insurance Commissioner to "rehabilitate GHMSI and rededicate the company's operations and surplus to nonprofit purposes and its charitable, public health mission"; and for appointment of a Special Master to "assist the Court in overseeing the rehabilitation of GHMSI." Id. Prayer for Relief.

GHMSI and CareFirst timely filed a Notice of Removal on July 16, 2008, on the ground that the Complaint presents a substantial question of federal law.

**ARGUMENT**

**I.    FEDERAL JURISDICTION EXISTS WHERE A STATE-LAW CLAIM NECESSARILY RAISES A DISPUTED, SUBSTANTIAL FEDERAL ISSUE.**

**A.    The Legal Framework**

A defendant may properly remove a state-court action to federal court when the federal court enjoys original jurisdiction. 28 U.S.C. § 1441(b). Federal courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Id. § 1331. A case "aris[es] under" federal law, in turn, if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983). Thus the Supreme Court has long recognized that "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." Grable, 545 U.S. at 312; see Smith v. Kansas City Title & Trust Co. 255 U.S. 180, 199 (1921) (finding federal jurisdiction over a state-law claim where "it appear[ed] from the [complaint] that the right to relief depends upon the construction or application" of federal law).

The Supreme Court has explained this doctrine's parameters twice in the last three years. In Grable, a unanimous Court affirmed the District Court's retention of jurisdiction in a case found to present a substantial federal question. 545 U.S. at 312. The plaintiff in Grable had lost

6

property to an Internal Revenue Service ("IRS") seizure; the IRS notified Grable of the seizure and then sold the property. Id. at 310. Five years later, Grable filed a state-law quiet-title action in state court, arguing that it still owned the seized property because the IRS "had failed to notify [Grable] of its seizure in the exact manner" required by federal statute. Id. at 311. The defendant removed the case to federal court, arguing that Grable's claim "depended on the interpretation of the notice statute in the federal tax law." Id. The District Court accepted jurisdiction on that basis. The Supreme Court agreed.

The Court explained that while there is no " 'single, precise, all-embracing test' for jurisdiction over federal issues embedded in state-law claims," a few factors are pertinent. Id. at 314 (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 821 (1988)) (Stevens, J., concurring). First, while a "mere need to apply federal law" will not create jurisdiction, it is a different matter if the claims " 'really and substantially involv[e] a dispute . . . respecting the validity, construction or effect of [federal] law.' " Id. at 312-313 (quoting Shulthis v. McDougal, 225 U.S. 561, 569 (1912)) (emphasis added). In the latter circumstance, there is both "a contested federal issue [and] a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum," and federal jurisdiction ordinarily will lie. Id. at 313. Second, exerting federal jurisdiction over even a "contested" and "substantial" federal issue is appropriate where it would be "consistent with congressional judgment about the sound division of labor between state and federal courts." Id. Where federal jurisdiction would not trigger a flood of newly federalized litigation, in other words, the federal court may take the case. See id.

Grable distilled these considerations into a three-part inquiry: "does a state-law claim necessarily raise [1] a stated federal issue, [2] actually disputed and substantial, [3] which a

federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.  Applying that framework, the Court found jurisdiction on the facts presented.  First, Grable had "premised its . . .claim" on the IRS's failure to obey federal law; thus "the meaning of the federal statute [was] an essential element" of the claim and was "actually in dispute." Id. at 314-315.  Second, the statute's meaning was "an important issue of federal law that sensibly belongs in a federal court." Id.  This was so because the government had a "direct interest" in a federal forum to vindicate its action. Id.  Finally, "because it will be the rare state title case that raises a contested matter of federal law," federal jurisdiction would "portend only a microscopic effect on the federal-state division of labor." Id.

The Court reaffirmed these principles a year later in Empire.  In that case, a federal employee who had been injured in an accident received more than $150,000 in medical coverage from a Blue Cross entity that contracted to cover federal workers. Empire, 547 U.S. at 687.  His estate subsequently won a large judgment against the tortfeasor who caused the accident, and his insurer, Empire, sued in federal court for reimbursement. Id.  Empire argued that federal jurisdiction existed because the Federal Employee Health Benefit Act ("FEHBA") preempted state law on issues relating to policy coverage. Id.  But as the Court observed, FEHBA itself did not speak to the subrogation issue at the core of Empire's claims:  Insurer subrogation rights were addressed in the contract between Blue Cross and the federal government, but the federal statute was silent on the subject. Id. at 679.  Empire's subrogation claim also was "fact-bound and situation-specific"; it required attention to details of sums paid for medical services and whether any of the charges had been duplicative or excessive. Id. at 701.

On these facts, the Empire Court held that federal-question jurisdiction was absent.  The "bottom-line practical issue" in Empire had no effect on the government; it involved only the

amount of money the insurer would receive as subrogee to a judgment rendered in a state-court tort case. <u>Id.</u> at 700. And while in contrast <u>Grable</u> "presented a nearly 'pure issue of law,' " <u>id.</u> (quoting <u>Hart & Wechsler</u> at 65), the Empire claim was "fact-bound," "contract-derived," and involved nothing more than an attempt to access "the proceeds of a . . . tort litigation." <u>Id.</u> at 701.[3] For these reasons the case did not fit within the category delineated by <u>Grable</u> of state claims for which federal-question jurisdiction was appropriate. <u>Id.</u> at 699.

**B.     Courts' Subsequent Application Of <u>Grable</u> And <u>Empire</u>**

Courts applying <u>Grable</u> and <u>Empire</u> have recognized that those cases give rise to a three-part inquiry: courts should ask whether the complaint necessarily raises a disputed federal question, whether that question is substantial, and whether the acceptance of jurisdiction would unduly alter the federal-state judicial balance. <u>E.g.</u>, <u>Nicodemus v. Union Pacific Corp.</u>, 440 F.3d 1227 (10th Cir. 2006); <u>accord</u> <u>Greene v. AFL-CIO, Local 2607</u>, No. Civ. L. 05-0408 (RMU), 2005 WL 3275903, at *2 (D.D.C. Sept. 7, 2005) (identifying the first two prongs and citing pre-<u>Grable</u> case law).

The cases to have interpreted <u>Grable</u> and <u>Empire</u> have paid particular attention to fleshing out the "substantiality" requirement. The Tenth Circuit, for instance, has held that courts analyzing substantiality "should inquire into whether resolution of the [federal] issue . . . would benefit from 'the advantages thought to be inherent in a federal forum,' " and whether "the government has a direct interest in the determination" of the disputed federal question. <u>Nicodemus</u>, 440 F.3d at 1236 (quoting <u>Grable</u>, 545 U.S. at 313). "A case should be dismissed

---

[3]     Opening the federal docket to fact-bound and recurring subrogation claims also obviously threatens to tip the balance of federal and state jurisdiction by inundating federal courts with insurer subrogation cases stemming from state torts committed against federal workers. <u>See</u> <u>Empire</u>, 547 U.S. at 681 (declining to create a "costly 'federal case' [out of] an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation").

for want of a substantial federal question only when the federal issue is (1) wholly insubstantial or obviously frivolous, (2) foreclosed by prior cases which have settled the issue one way or another, or (3) so patently without merit as to require no meaningful consideration." Id. (internal quotations and citations omitted); accord Mikulski v. Centerior Energy Corp., 501 F.3d 555, 568 (6th Cir. 2007) (explaining that a federal question is "important" under Empire so long as it is "not trivial"). Other courts, including this Court, have observed that a question is more likely substantial if it is a "pure issue of law" that "could be settled once and for all" by an assertion of federal jurisdiction, Pac. Gas and Elec. Co. v. Ariz. Elec. Power Coop., Inc., 479 F. Supp. 2d 1113, 1122-23 (E.D. Cal. 2007) (quoting Empire, 547 U.S. at 700), and if it plays a truly "central role" in the dispute before the court, Bender v. Jordan, 525 F. Supp. 2d 198, 204 (D.D.C. 2007); accord Utah v. Eli Lilly & Co., 509 F. Supp. 2d 1016, 1022 (D. Utah 2007).

## II.    THIS COURT HAS FEDERAL QUESTION JURISDICTION UNDER THE TEST ENUNCIATED IN GRABLE AND EMPIRE.

GHMSI and CareFirst properly removed this case: It necessarily raises a disputed federal issue, that issue is substantial, and this Court's assertion of jurisdiction would not unduly alter the federal-state judicial balance.

### A.    The Complaint Necessarily Raises A Disputed Federal Issue.

The District's two-count Complaint "necessarily raise[s] a stated federal issue" that is "actually disputed," Grable, 545 U.S. at 314, because the District cannot obtain relief on either count without this Court addressing, interpreting, and resolving critical language in GHMSI's federal charter.

The charter that created GHMSI was enacted by Congress in 1939. A charter is a "legislative act[]" that must be construed and interpreted just like any other federal statute. Board of Dirs., Wash. City Orphan Asylum v. Bd. of Trs., Wash. City Orphan Asylum, 798 A.2d

1068, 1080 (D.C. 2002).  Section 3 of the charter sets forth GHMSI's corporate purpose:  it "shall not be conducted for profit, but shall be conducted for the benefit of the aforesaid certificate holders."  Ex. 2 (Charter § 3); see Pub. L. No. 76-395, 53 Stat. 1412 (1939).  The construction and meaning of this and other provisions in the federal charter form the very core of the District's Complaint.

Count I of the Complaint alleges that GHMSI and CareFirst "willfully violated GHMSI's charter" by maintaining reserves (also called "surplus") at a level beyond what the District apparently thinks is necessary or appropriate.  Complaint ¶ 28.  According to the District, GHMSI's Congressional charter requires GHMSI and CareFirst to redistribute some unspecified amount of its reserves to "promote public health" – for example, by spending tens of millions of additional dollars a year beyond GHMSI's current substantial commitments on general "community benefit programs."  Complaint ¶¶ 1, 18.  The Complaint alleges that GHMSI's failure to provide additional charitable donations violates the charter and provides "grounds for rehabilitation" pursuant to D.C. Code § 31-1310(9).  Thus, to prevail on the rehabilitation claim in Count I, plaintiffs would have to prove that GHMSI "willfully violated" its Congressional charter.  D.C. Code § 31-1310(9).

Likewise, Count II alleges that GHMSI breached some unspecified common-law charitable-trust duty "[b]y using [its] assets inconsistently with its charitable purposes."  Complaint ¶ 31.  The Complaint elsewhere alleges that GHMSI's "charitable purpose" is defined by its federal charter.  Id. ¶ 8.  Thus Count II, like Count I, cannot be proved without a finding by this Court that (i) the Congressional charter means what the District says it means and therefore (ii) GHMSI's actions amount to a federal charter violation.  See also Prayer For Relief ¶ a

(asking as the very first item of relief that the Court "[d]eclare that Defendants have violated GHMSI's charter").

In short, this case is not at all like <u>Empire</u>, where a federal statute merely existed in the background of a dispute that did not require the interpretation of federal law. It is, instead, far more akin to <u>Grable</u>, where the plaintiff "premised . . . its claim" on the meaning of federal law. Here, as in <u>Grable</u>, this case " 'really and substantially involv[es] a dispute . . . respecting the validity, construction, or effect' " of a Congressional act – in this case, GHMSI's charter. <u>Grable</u>, 545 U.S. at 312-313, 315 (quoting <u>Shulthis</u>, 225 U.S. at 569). In such situations courts have had no trouble concluding that similar complaints "necessarily raise a stated federal issue." <u>Id.</u> at 314. <u>See, e.g.</u>, <u>Bobo v. Christus Health</u>, 359 F. Supp. 2d 552, 554 (E.D. Tex. 2005) (finding the requisite federal issue where plaintiff alleged that the defendant not-for-profit hospital charged unreasonable rates for medical care "in violation of its tax exemption agreements with the United States").

Nor is there any doubt that the federal issue raised here is "actually disputed." <u>Grable</u>, 545 U.S. at 314. GHMSI and CareFirst flatly disagree with the District's expansive and unprecedented interpretation of GHMSI's federal charter.[4] GHMSI's charter by its express terms requires that GHMSI's business "be conducted for the benefit of [its] certificate holders," Ex. 2 (Charter § 3), a straightforward application of Congress's empowering documents, buttressed by the charter's legislative history. "[I]t is clear that the federal question is actually disputed." <u>Nicodemus</u>, 440 F.3d at 1236. Accordingly, the first <u>Grable</u> prong is met.

**B.    The Federal Issue Is Substantial.**

---

[4]    Under the current schedule set by the Court, CareFirst's and GHMSI's initial response to the District's Complaint is due on September 5, 2008. At that time, CareFirst and GHMSI plan to move to dismiss the Complaint in its entirety because the Complaint – and its unprecedented interpretation of GHMSI's federal charter – fails to state a claim on which relief can be granted.

The federal issue raised and disputed here – the meaning of GHMSI's congressional charter – likewise is "substantial." <u>Grable</u>, 545 U.S. at 314. The District has challenged the core mission of an entity Congress created nearly seventy years ago and whose charter Congress has revisited and amended several times since. Indeed, Congress has been concerned enough with GHMSI's proper role to author committee reports opining on the organization's "primary mission." The federal government thus plainly "has a direct interest in the determination" of the disputed federal question. <u>Nicodemus</u>, 440 F.3d at 1236 (quoting <u>Grable</u>, 545 U.S. at 313). At the very least, one could hardly characterize an issue bearing on the scope of a federal charter – the document codifying GHMSI's corporate existence as a federally created entity – as "wholly insubstantial," <u>Nicodemus</u>, 440 F.3d at 1236, or "trivial," <u>Mikulski</u>, 501 F.3d at 568. For this reason alone, the federal issue easily meets the substantiality standard established in <u>Grable</u> and <u>Empire</u>.

The federal issue presented here, as in <u>Grable</u>, also is a "nearly pure issue of law" that "could be settled once and for all" by an assertion of federal jurisdiction. <u>Empire</u>, 547 U.S. at 700. The crux of the dispute is the federal charter's meaning. This question can be resolved through pure statutory interpretation of the charter; it is not a "fact-bound" and "contract-derived" issue that would drag the court into small disputes – such as squabbles over discrete overpayments and underpayments – more properly addressed in state court. <u>Empire</u>, 547 U.S. at 701. For this reason too, the federal issue is "significantly more substantial" than that posed by <u>Empire</u>. <u>Insurance Corp. v. Monroe Bus Corp.</u>, 491 F. Supp. 2d 430, 436 (S.D.N.Y. 2007).

The federal issue presented here also meets the practical test of substantiality laid down by <u>Grable</u>: Its resolution would benefit from "the advantages thought to be inherent in a federal forum." 545 U.S. at 313. As alleged in the Complaint, GHMSI is an interstate operation with

13

hundreds of thousands of certificateholders in Virginia and Maryland. See Complaint ¶ 4.
Where the issue at stake relates to the obligations under a federal charter of a federally-created
entity whose operations affect three jurisdictions, the "advantages thought to be inherent in a
federal forum" are at their apex. See Ormet Corp. v. Ohio Power Co., 98 F.3d 799, 807 (4th Cir.
1996) (noting that "[t]he determination of whether a federal issue is sufficiently substantial
should be informed by a sensitive judgment about whether the existence of federal judicial power
is both appropriate and pragmatic" and that it must take account of "the historical reasons for
establishing federal courts").

To be sure, the Empire court listed other factors relevant to the substantiality analysis,
including whether a federal agency is directly involved in the case and whether the outcome
"would be controlling in numerous other cases." 547 U.S. at 700. But the absence of those
particular facts here hardly outweighs the presence of all those described above. As courts
applying Empire have explained, "certain of [Empire's substantiality considerations] may be
more applicable than others in any given set of circumstances" and "no single factor is
dispositive." Mikulski, 501 F.3d at 570. Here, as in Nicodemus, the disputed federal question is
substantial on its own terms, regardless of what its effect might be on entities beyond those in
this case. See 440 F.3d at 1236 ("We agree that the contested interpretation of the federal land-
grant statutes as between these parties involves a substantial federal issue.") (emphasis added).

**C.    An Assertion Of Jurisdiction By This Court Would Not Alter The Federal-
        State Balance.**

Finally, the Court may take this case "without disturbing any congressionally approved
balance of federal and state judicial responsibilities." Grable, 545 U.S. 314. GHMSI is, to our
knowledge, the only insurer in the nation whose corporate existence is established by
Congressional charter. Retaining and resolving this action in federal court thus does not threaten

14

to draw into federal court countless cases involving interpretation of a federally chartered insurer. Here, more so even than in <u>Grable</u>, exercising "federal jurisdiction to resolve genuine disagreement" over these charter provisions "will portend only a microscopic effect on the federal-state division of labor." <u>Id.</u> at 315.

## **CONCLUSION**

For all of the foregoing reasons, this Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331, and removal was accordingly proper under 28 U.S.C. § 1441(b).

Respectfully Submitted,

Dated: August 4, 2008

By:_____/S/_____

Craig A. Hoover, Esq. (D.C. Bar No. 386918)
E. Desmond Hogan (D.C. Bar No. 458044)
**HOGAN & HARTSON L.L.P.**
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Phone: (202) 637-5600
Fax: (202) 637-5910
E-mail: cahoover@hhlaw.com
E-mail: edhogan@hhlaw.com

Attorneys for Defendants
Group Hospitalization and Medical Services, Inc.
and CareFirst, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Response to the Court's July 21, 2008 Order

was served this 4th day of August, 2008, by first-class mail, postage prepaid, upon:

> Peter J. Nickles
> George C. Valentine
> Office of the Attorney General
> 441 4th Street, N.W., Suite 1130-N
> Washington, D.C. 20001

I further certify that a copy of the foregoing Response to the Court's July 21, 2008 Order

was served this 4th day of August, 2008, by way of the Court's ECF system, upon:

> Ellen A. Efros
> Bennett Rushkoff
> Office of the Attorney General
> 441 4th Street, N.W., Suite 1130-N
> Washington, D.C. 20001

> Attorneys for Plaintiff District of Columbia

/S/
_____
E. Desmond Hogan

EXHIBIT 1

**REPORT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF INSURANCE, SECURITIES, AND BANKING**
*Lawrence H. Mirel, Commissioner*

---

**In the Matter of: Inquiry into the Charitable Obligations of
GHMSI/CareFirst in the District of Columbia**

---

## I. PURPOSE

This report sets forth the findings and recommendations of the Department of

Insurance, Securities, and Banking ("Department") based on its inquiry into the

charitable obligations of Group Hospitalization and Medical Services, Inc. ("GHMSI") in

the District of Columbia. Specifically, the report addresses the following issues:

1.  Whether GHMSI has a legal obligation to engage in charitable activities.

2.  If such an obligation exists, what is the nature and extent of that obligation.

3. If such an obligation exists, is GHMSI adequately meeting that obligation.

The Department initiated this inquiry in large part in response to a

December 2004 report of the DC Appleseed Center ("Appleseed"), a non-profit

institution located in the District of Columbia.[1] The Appleseed Report argued that:

GHMSI was "legally obligated to provide charitable activities within its service area";

GHMSI was "not meeting [its] charitable obligation to the citizens of the National

Capital Area"; based on its "significant surpluses", GHMSI could and should commit

millions of additional dollars each year to charitable activities; and GHMSI could make

these additional charitable commitments while still remaining "viable and competitive".[2]

---

[1] *CareFirst: Meeting Its Charitable Obligation to Citizens of the National Capital Area*, DC Appleseed
Center for Law and Justice, December 2004 ("Appleseed Report").
[2] Appleseed Report at I-1 and I-9 through I-10.

Even though, as set forth below, the Department does not agree with all of the assertions in the Appleseed Report, it does agree with Appleseed's primary premise: GHMSI, as a strong and responsible provider of health care insurance in its service area, can and should do more to promote and safeguard the public health of the residents of the District of Columbia.

## II. SUMMARY OF FINDINGS

Based on the record before us, the Department finds the following:

o GHMSI has a legal obligation under its charter to operate as a non-profit charitable and benevolent institution.

o GHMSI is meeting its basic obligation as a charitable institution by operating a non-profit health plan that serves residents throughout its service area, including the District of Columbia.

o GHMSI's charter allows the corporation to engage in charitable activity, other than the provision of health insurance, that promotes and safeguards the public health.

o GHMSI, as a major corporation operating in the District of Columbia, has a responsibility to engage in activities which benefit the residents of the District.

o GHMSI can and should engage in additional charitable activities in the District that benefit and promote the health of all District residents.

o It is the obligation of GHMSI's Board of Trustees, in the first instance, to determine the amount of additional charitable activity and the specific beneficiaries of this charitable activity.

2

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

## III.  BACKGROUND

A. History of GHMSI

GHMSI began its existence in 1934 as a hospital association under the name of Group Hospitalization, Inc. ("GHI").[3]  GHI was reconstituted in 1939 as a non-profit corporation through a Congressionally granted charter, and several of the provisions of that charter are at the core of this proceeding.[4]  Specifically, the charter contains the following relevant provisions:

> *"Sec. 2.  [Group Hospitalization, Inc.] is...authorized and empowered (a) to enter into contracts with individuals or groups of individuals to provide for hospitalization of such individuals, upon payment of specified rates or premiums, and to issue to such individuals appropriate certificates evidencing such contracts; (b) to enter into contracts with hospitals for the care and treatment of such individuals, in accordance with the terms of such certificates; and (c) to cooperate, consolidate, or contract with groups or organizations interested in promoting and safeguarding the public health.*
>
> *"Sec. 3.  [Group Hospitalization, Inc.] shall not be conducted for profit, but shall be conducted for the benefit of the aforesaid certificate holders....*
>
> *"Sec. 8.  [Group Hospitalization, Inc.] is hereby declared to be a charitable and benevolent institution, and all of its funds and property shall be exempt from taxation other than taxes on real estate."*

After the grant of its charter, and through a series of transactions not directly relevant to this proceeding, GHI merged with Medical Services, Inc. to form GHMSI, also known as Blue Cross/Blue Shield of the National Capital Area ("BCBSNCA").

GHMSI provides Blue Cross/Blue Shield health benefits to subscribers in its service area,

---

[3] *See* "CareFirst History and Timeline", http://www.carefirst.com/company/html/Timeline.html.
[4] *See* An Act providing for the incorporation of certain persons as Group Hospitalization, Inc., 53 Stat. 1412, P.L. 395 (1939) ("GHMSI charter").  The GHMSI charter has been amended by Congress several times since 1939.  The Department finds, however, that these amendments are not relevant to the current proceeding.

which includes the District of Columbia, Prince George's and Montgomery Counties in

Maryland, and a portion of Northern Virginia. In 1998 GHMSI joined with Blue

Cross/Blue Shield of Maryland, Inc. ("BCBSMD," also known as "CareFirst of

Maryland, Inc."), which provides Blue Cross/Blue Shield services to the rest of

Maryland, in forming a holding company, CareFirst, Inc., a non-profit Maryland

corporation.[5] GHMSI, however, remains a District of Columbia domestic corporation

under the primary regulatory authority of the District of Columbia Department of

Insurance, Securities and Banking.[6] GHMSI currently has 1.2 million subscribers in its

service area. Of those, 132,000 reside in the District, 280,000 live in Northern Virginia,

and 746,000 live in Montgomery and Prince George's Counties, Maryland.[7]

## B. Appleseed Report

The DC Appleseed Center is a non-profit advocacy organization headquartered in

the District of Columbia. The mission of Appleseed is to "identify serious local issues,

research and analyze them, develop and publish recommendations for systemic reform,

and advocate for appropriate solutions."[8] In December 2004, Appleseed issued a report

titled "CareFirst: Meeting Its Charitable Obligation to Citizens of the National Capital

Area." In its report Appleseed makes the following core assertions:

---

[5] In 2001, CareFirst announced its intention to convert to for-profit status and be acquired by WellPoint Health Networks. The proposed conversion was rejected by the Maryland Insurance Commissioner and the planned merger was later abandoned.
[6] In 2000, Blue Cross Blue Shield of Delaware ("BCBSD") became part of the CareFirst, Inc. holding company. BCBSD remains a separate corporation under the primary regulatory authority of its domestic regulator, the Insurance Commissioner of Delaware.
[7] *See* testimony of William L. Jews, president and chief executive officer of GHMSI and of CareFirst, Inc.. Hearing Transcript at 26-27. Overall, including its programs in Delaware and the remainder of Maryland, CareFirst companies have 3.3 million subscribers. Hearing Transcript at 26.
[8] *See* Appleseed Report at ii.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

"GHMSI's federal charter means what it says: GHMSI is legally obligated to provide charitable activities within its service area.

"GHMSI's board of directors has a fiduciary and legal obligation to ensure that GHMSI fulfills its charitable obligation....

"GHMSI's legal obligation is as follows: it must use its revenues and surplus to perform charitable activities to the maximum feasible extent, consistent with its need to remain viable and competitive.

"GHMSI is financially capable of engaging in charitable activities at a much higher rate than it is currently doing, and still remain viable and competitive. Specifically, it could spend between 2 and 3 percent of its earned annual premiums to charitable activities and still maintain its current pricing structure, its level of competitiveness, and a high level of surplus.

"Using this 2 to 3 percent measurement, GHMSI could spend between 41 and 61 million dollars on charitable activities in 2004. By 2008, assuming as much as 10 percent annual growth in total premium revenues, GHMSI could spend between 67 and 100 million dollars on charitable activities, and still remain viable and competitive."[9]

Appleseed concluded that GHMSI was not meeting its charitable

obligation to the residents of the national capital area.

C. Issuance of notice and holding of public hearing

In response to the Appleseed Report, the Department in early 2005 initiated an

inquiry into the charitable obligations of GHMSI. On February 15, 2005, the

Commissioner announced that the Department would hold a public hearing on March 24,

2005, to receive testimony from GHMSI, Appleseed, and the public on the questions set

forth in the first section of this report.[10]

---

[9] Appleseed Report at I-1.
[10] The hearing notice was published in the District of Columbia Register on February 18, 2005. *See* 52 D.C. Reg. 1579.

The Commissioner convened the public hearing at 10:00 a.m. on Thursday,

March 24, 2005, in the First Floor Auditorium at One Judiciary Square (441 Fourth

Street, NW). The hearing was adjourned at 4:30 p.m., and the record was left open until

April 8, 2005. The Department received oral and written testimony from over 40

witnesses. Portions of the testimony are referenced in this report.[11]

## IV. ANALYSIS

### A. Legal Obligation to Operate as a Charitable Entity

The initial issue before the Department is the following: Does GHMSI have a

legal obligation to engage in charitable activities?

Appleseed argued in its testimony to the Commissioner that GHMSI is "legally

obligated to provide charitable activities within its service area", and that GHMSI has a

specific "obligation to pursue a charitable, public health mission."[12] Appleseed based its

argument in large part on the language of section 8 of GHMSI's federal charter, which

established GHMSI as a "charitable and benevolent institution".[13] In its testimony,

Appleseed sought to refute arguments that GHMSI's charitable obligation was obsolete

or had no legal effect and that GHMSI's charitable obligation would be inconsistent with

its mandate to operate for the benefit of its certificate holders.[14]

---

[11] A complete written transcript of the hearing is available from Miller Reporting Company, Inc., 735 8th Street, S.E., Washington, D.C. 20003, 202-546-6666.
[12] Appleseed Report at I-1. The word "testimony," when used in this report, may refer to either the oral or written testimony of the witness. The specific form of the testimony will be set forth in this report.
[13] Appleseed Report at II-8 through II-17. Appleseed also argued briefly that District law also required GHMSI to "use its assets for the benefit of the public beyond its current policyholders ...at least with respect to health education programs. Appleseed Report at II-22
[14] Appleseed Report at II-9 through II-21.

GHMSI did not dispute that it is legally obligated to engage in charitable activities; rather, GHMSI argued that it fulfills its charitable obligation by operating a non-profit health plan.

The Department finds that GHMSI was established with a charitable obligation, and that GHMSI continues to be bound by that obligation.  (This conclusion is supported by a recent opinion of the Attorney General of the District of Columbia.)[15]  The plain language of section 8 of GHMSI's charter, which has not been substantively modified in the over 65 years of its existence, makes this clear. Appleseed and GHMSI do not disagree on this point.  Where they differ is over the content of that charitable obligation.

B.  Content of Legal Obligation

Having determined that GHMSI has a legal obligation to engage in charitable activities, the key issue before the Department then becomes: What is the content of GHMSI's charitable obligation?  Does the operation of a non-profit health plan satisfy that obligation?  Or is GHMSI required to do more?  Specifically is GHMSI required to fund other health-related activities in its service area, as Appleseed claims?

GHMSI argues that Congress "intended that GHMSI would operate specifically for the benefits of its subscribers … not for the benefit of the 'public at large.'"[16]  In the words of Andrew H. Marks, attorney for GHMSI:

---

[15] After the Department initiated this proceeding and announced its hearing, the Attorney General of the District of Columbia issued a memorandum on various issues related to the Appleseed Report.  *See* Memorandum from Attorney General Robert Spagnoletti to City Administrator Robert Bobb (dated March 4, 2005) ("AG Opinion").  In that memorandum, the Attorney General stated that GHMSI "was chartered by Congress as a 'charitable and benevolent institution' [and] has an obligation to pursue a public health mission."  AG Opinion at 1.

[16] Testimony of Andrew H. Marks, attorney for GHMSI ("Marks Testimony") at 2.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

"GHMSI's revenues, which Appleseed seeks to require GHMSI to donate to public health and other charitable causes, are primarily funds paid by GHMSI's subscribers as premiums. GHMSI's Charter requires the company's trustees to act as responsible stewards of those funds and to use them for the benefit of the subscribers who paid those premiums. There is no principled basis for concluding that Congress, when it originally chartered GHMSI, intended GHMSI's subscribers to provide a general funding source for good works in the community."[17]

GHMSI's position is that the provision of health insurance itself constitutes a charitable activity. GHMSI argues that when it was chartered, plans such as GHMSI's "represented a significant innovation in health care" and that GHMSI, at the time of its formation, "provid[ed] a necessary service to the community, and to the hospitals they also served, that would otherwise go unmet."[18] The key point GHMSI makes is that its intended "'charitable' purpose was precisely the provision of insurance benefits to [its] subscribers."[19]

Appleseed, on the other hand, argues that GHMSI's charitable obligations are much broader. Appleseed claims that under federal case law "a charitable organization may not be operated for the benefit of its subscribers alone" and that "to qualify as a charitable organization, an organization must provide a substantial 'community benefit'."[20] Specifically, Appleseed concludes, "GHMSI's obligation is to foster public health initiatives, by providing services such as health education, health care research, participation in public programs, and subsidized coverage to the public in the National Capital area beyond its policy holders."[21]

---

[17] Marks Testimony at 2-3.
[18] Marks Testimony at 5.
[19] Marks Testimony at 5.
[20] Appleseed Report at II-24.
[21] Appleseed Report at I-8.

Based on the record before it, the Department finds that the provision of health insurance by GHMSI constitutes a charitable activity under its charter. As GHMSI has noted, the provision of health insurance during the period in which it was chartered was considered a charitable activity. It therefore seems likely that Congress intended this activity to be considered charitable for the purposes of GHMSI's charter. Moreover, if the Department were to determine that Congress had not intended for the provision of health insurance to be considered a charitable activity, this would lead to the unlikely conclusion that Congress had created GHMSI as a charitable organization but had also mandated that its primary mission be a non-charitable activity (*i.e.*, the provision of health insurance). The Department finds this conclusion untenable.

The Department also finds unpersuasive Appleseed's argument that GHMSI has a charitable obligation to the public at large. In reaching its conclusion, Appleseed relies mainly on federal and state cases finding that organizations must have a general community benefit in order to be considered charitable organizations under the tax laws. That test is inapposite here.[22] The issue before the Department is to determine the definition of "charitable" under GHMSI's charter, not under the tax laws.[23] The evidence

---

[22] We note that GHMSI is not a tax-exempt charitable organization under the Internal Revenue Code. Congress enacted legislation in 1986 withdrawing the tax exemption of GHMSI and all similar non-profit Blue Cross/Blue Shield plans. Tax Reform Act of 1986, § 1012(a),(b). (100 Stat.2085; 26 U.S.C. §§ 501(m) and 833). Although GHMSI receives some tax advantages because it provides an open enrollment product, it pays substantial taxes to both the District and the Federal Governments. In 2004 it paid $5.7 million in District taxes and $31 million in Federal taxes. *See* testimony of Robert Willis, member of the GHMSI Board of Trustees, Hearing Transcript at 29-30.

[23] The Attorney General similarly rejects the application of tax law cases to the determination of what constitutes charitable activities under GHMSI's charter. *See* AG Opinion at 5. The Department also does not agree with the argument in Appleseed's supplemental report that the doctrine of *cy pres* should be applied to the charitable purpose set forth in GHMSI's charter. See "CareFirst is Not Meeting Its Charitable Obligation to Citizens of the National Capital Area," at 9 (citing section 399 of the Restatement Second of Trusts) ("Appleseed Supplemental Comments"). The Department does not find that GHMSI's

9

before us strongly indicates that the provision of health insurance to its subscribers (and the offering of health insurance on a generalized basis) constitutes charitable activity under GHMSI's charter, and the Department so finds.

The Department's determination is bolstered by the opinion of the Attorney General. The Attorney General found that "GHMSI may meet its obligation under its charter through the operation of non-profit health plans, even if the only direct beneficiaries are the plans' past, current, and future paying subscribers."[24] The Attorney General based his decision largely on the legal principles related to charitable trusts, which he determined would apply to GHMSI.[25]

## C. Responsibility of GHMSI to Engage in Additional Charitable Activities

Although GHMSI may satisfy the charitable obligation under its charter solely by providing health insurance in its service area — and although its primary obligation is to its subscribers — that determination does not end the Department's inquiry. The Department finds that GHMSI can and should engage in more charitable activity in the District of Columbia.

### i. Authority and responsibility to engage in additional activity

The Department finds that GHMSI has the legal authority to engage in charitable activity beyond the provision of health insurance. First, the charter authorizes GHMSI

---

original charitable purpose is now "impractical or impossible," a finding that must be made before this aspect of the *cy pres* doctrine may be invoked. It bears noting, moreover, that if a court were to find that carrying out GHMSI's original charitable purpose is now impractical or impossible (and the application of the *cy pres* doctrine was therefore appropriate) the court might require GHMSI to cease providing health insurance coverage. The Department finds that such a result would not benefit GHMSI's subscribers nor the community at large.
[24] AG Opinion at 2.
[25] AG Opinion at 2-5.

"to cooperate, consolidate, or contract with groups or organizations interested in promoting and safeguarding the public health."[26]  Moreover, we agree with the opinion of the Attorney General that GHMSI has a "public health mission" and that GHMSI may support health-related education for the general public, support other charitable organizations in promoting the public health, and engage in cooperative efforts with private entities and the government to promote public health.[27]

Indeed, GHMSI itself recognized in its testimony before the Department that it is empowered to engage in charitable activities beyond its provision of health insurance,[28] and GHMSI stated that it had contributed several hundred thousand dollars to various charitable organizations in the District in 2003 and 2004.[29]

We find that not only does GHMSI have the authority to engage in charitable activity outside of the provision of health insurance, it has the responsibility to engage in such activity.  As a major corporate citizen of the District of Columbia, and as the major health insurer in the District, GHMSI has a social responsibility that goes beyond its basic legal obligations; this responsibility includes the requirement to engage in charitable activities beyond GHMSI's primary mission of providing health insurance.

ii.  Content of responsibility

The Department finds that GHMSI's additional charitable activities must be confined primarily to the area of public health.  The most expansive powers provision in

---

[26] GHMSI charter § 2.
[27] AG Opinion at 1, 7-8.
[28] *See, e.g.*, testimony of Carol Keehan, member of the GHMSI Board of Trustees, Hearing Transcript at 62 ("[I]f we have surplus that we don't believe we absolutely must have…we can use some of that for the community, to improve the health status of the community" but GHMSI's "first and foremost responsibility" is to subscribers.).
[29] Written testimony of Carol Keehan, member of the GHMSI Board of Trustees, at 2.

GHMSI's charter provides it with the authority to work with organizations to "promot[e] and safeguard[ ] the public health."[30]  There is no explicit provision in the charter that grants broader authority to GHMSI.   Although the charter does not specifically prohibit non-public health activity, it seems clear that the general purpose of the organization was intended to be the furtherance of the public health.  The Department therefore determines that GHMSI's charitable activities must be limited primarily to this area.  This conclusion is consistent both with the opinion of the Attorney General and with the arguments put forth by Appleseed.[31]

Within the area of public health, there are many organizations and activities GHMSI might support.  In its report, Appleseed provided extensive information on such programs, including "effective education to promote healthy behaviors; greater access to mental health adult and child health services; language and cultural competency; quality of care; and emergency preparedness."[32]  The public health needs of the District of Columbia are extensive and diverse.[33]

---

[30] GHMSI charter § 2(c).
[31] The Attorney General concluded that GHMSI "has an obligation to pursue a public health mission".  AG Opinion at 1.  The Appleseed Report also made this determination.  *See* Appleseed Report at II-8 ("GHMSI has an obligation to pursue a charitable, public health mission.").
[32] Appleseed Report at III-5.
[33] Several of the witnesses at the hearing proposed specific activities GHMSI could support, including the following:
- Mark Ouellette, director of the D.C. Children and Youth Investment Trust Corporation, suggested that charitable funds from GHMSI could be used to address the issue of childhood obesity. (Hearing Transcript at 191-192).
- Frances Gemmill, president of the D.C. League of Women Voters, recommended that GHMSI: support the expansion of the "D.C. [Healthcare] Alliance to include everybody below 200 to 400 percent of the federal poverty level"; assist "low-income residents, especially children, get dental care"; and offer "affordable individual insurance policies to members with pre-existing conditions". (Hearing Transcript at 234-235).
- Cheryl Fish-Parcham, representing Families USA, suggested that GHMSI implement a "high-risk pool coupled with a sliding fee scale public insurance program"; "subsidize care through the

Each of these suggestions (and other presented at the hearing and in written testimony)

merit consideration by GHMSI.[34] The Department finds, however, that is the

---

Alliance for an additional number of people"; and/or provide resources for prescription drug assistance. (Hearing Transcript at 247-248).

- Mary McCall, representing the Metropolitan Washington Public Health Association, suggested that GHMSI could: provide "higher-risk persons and small businesses with more advantageous rates"; expand the reach of the DC Healthcare Alliance; "subsidize oral health services for Medicaid, Alliance, and other under-insured persons"; and fund "a full-time nurse [for] each of the District's public schools". (Hearing Transcript at 240-241).
- Victor Freeman, president of the Medical Society of the District of Columbia, suggested that GHMSI provide "direct support to primary care clinics and/or fund neighborhood wellness and health promotion programs in those clinics."(Hearing Transcript at 260).
- N. Thomas Connally, medical director of the Arlington Virginia Free Clinic, suggested that the money be spent on "preventive health care measures" and "volunteer organizations that can leverage volunteer help." (Hearing Transcript at 293).
- Margot Aronson, president of the Greater Washington Society for Clinical Social Work, "urge[d] that the mental health needs of the community be considered in any public conversation about what health services might be supported by charitable activity from CareFirst." (Hearing Transcript at 311).
- Sharon Baskerville, executive director of the D.C. Primary Care Association, suggested that GHMSI's charitable funds be used to: "create a medically vulnerable facilities fund, for expanding primary care clinics, special medical needs, housing including seniors, mental health facilities, community residential facilities, which could be tied into the overall Medical Homes D.C. initiative." Ms. Baskerville also suggested that a loan repayment or scholarship program be created "for health professionals that agree to locate and practice in designated primary care shortage areas for a set number of years." Ms. Baskerville further suggested that funds be used to expand the D.C. Healthcare Alliance or to create a buy-in program "to include all residents between 200 and 400 percent of poverty." (Hearing Transcript at 337-338).

[34] Several witnesses at the hearing provided positive testimony on current GHMSI community activities:
- Anthony Evans, president of the D.C. Black Church Initiative, stated that he "[stood] up to be counted among those who are willing to testify publicly to the great outreach that CareFirst is doing." Mr. Evans spoke of CareFirst's funding for his initiative to provide public information on diabetes to the District's African American population, and added that he "believe[s] that the findings of the Appleseed report are misleading, erroneous, and do not reflect the generosity and contributions that CareFirst has made to the District of Columbia and the metropolitan area." (Hearing Transcript at 206-210).
- Vincent Keane, chief executive officer of Unity Health Care, spoke of his organization's "positive experience with CareFirst," which provides funding for Unity's "Health Care for the Homeless" program. (Hearing Transcript at 224-226).
- Anthony Owens, communications director for United Way of the National Capital Area, testified that he believes that "CareFirst shares the essence of the same values and vision as United Way," and added that CareFirst made a "corporate match donation of $177,000" to the United Way's 2004 fundraising campaign. (Tr. 280).
- Pam Katz, executive director of the Juvenile Diabetes Research Foundation/Capital Chapter ("JDRF") said that JDRF was "pleased to have CareFirst as a very generous donor. (Hearing Transcript at 274-276 )
- Nancy Rosen, chief executive officer of Sister to Sister Foundation, said that CareFirst-GHMSI "generously donated and actively participated in our National Women's Heart Day campaign in

responsibility of GHMSI's Board of Trustees to determine the public health initiatives to which GHMSI will provide contributions or assistance, and the Department therefore declines to make recommendations on specific charitable activities.

The Department does note, however, that it continues to be critical of GHMSI's administration of the open enrollment program it is required to maintain by law.[35]  Under that statute GHMSI is permitted to pay the 1% premium tax that would ordinarily go to the District's general fund into a separate Rate Stabilization Fund, the monies to be used to subsidize open enrollment contracts to assure competitive rates.  Although the Rate Stabilization Fund has built up a balance of more than $4 million, subscribers to the open enrollment program have been few.  As of the date of the hearing there were only 275 persons enrolled.[36]  Accordingly the Department has required that GHMSI pay its premium tax for 2004 to the general fund instead of to the Rate Stabilization Fund and has told GHMSI that it will do the same in future years unless and until GHMSI has properly advertised the availability of the open enrollment program and spent down the funds already committed to that program. [37]

### iii.  Extent of responsibility

The remaining question before the Department is GHMSI's capacity — in terms of dollars — to make charitable donations to the community at large.  Appleseed argues

---

Washington, D.C.," and had "responsibly worked to help collaborate with the community to advance health care and to support public and private efforts to meet the needs of persons lacking health insurance."  (Hearing Transcript at 215-216 ).

[35] *See* § 15 of the Hospital and Medical Services Corporation Regulatory Act of 1996 (D.C. Law 11-245; D.C. Official Code § 31-3514).
[36] *See* testimony of William L. Jews, Hearing Transcript at 67.
[37] On May 2, 2005, GHMSI filed an amended tax return with the District of Columbia Government along with a check in the amount of $2,776,258.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

that GHMSI "must use its revenues and surplus to perform charitable activities to the maximum feasible extent, consistent with its need to remain viable and competitive."[38] Under these standards, Appleseed argues, GHMSI "could spend between 41 and 61 million dollars on charitable activities in 2004" and between "67 and 100 million dollars on charitable activities" by 2008.[39] Several of the witnesses at the hearing also argued for contributions in this range.[40]

In its testimony CareFirst stated that in 2004 it provided $2.6 million to support local charitable and non-profit organizations in its entire service area, which includes Delaware, Maryland and Northern Virginia, as well as the District of Columbia. That figure represents 2% of its net operating income in that year.[41] Of this amount $1.3 million, or 49%, went to District of Columbia organizations.[42] In 2005 CareFirst says it intends to increase its annual giving to $8.7 million, or 7.3% of its expected net operating income for the year.[43] Assuming the same ratio of spending in the current year, approximately half of that total, or $4.35 million, would go to District of Columbia organizations.

---

[38] Appleseed Report at I-1.

[39] Appleseed Report at I-1.

[40] *See, e.g.*, testimony of: Frances Gemmill, president of the D.C. League of Women Voters, Hearing Transcript at 229 ($50 million to $100 million); Mary McCall, Metropolitan Washington Public Health Association, Hearing Transcript at 240 ($100 million); Sharon Baskerville, executive director, D.C. Primary Care Association, Hearing Transcript at 335 ($40 million to $61 million for 2004).

[41] *See* testimony of William L. Jews, Hearing Transcript at 54.

[42] GHMSI's testimony indicates that only approximately 11% of GHMSI's members are District residents, and of CareFirst's total members only 4% are District residents. *See* written testimony of GHMSI, at second exhibit. Appleseed, on the other hand, states that in 2003, 68.8% of GHMSI's total enrollees were enrolled in the District, 17.7% were enrolled in Maryland, and 13.5% were enrolled in Virginia. We believe that that both sets of figures are probably correct. The Appleseed figures are based on where policyholders were *enrolled*, and includes Federal Government employees, while the CareFirst figures show where policyholders *live*. Since insurance is typically sold at the workplace, it is not surprising that a high proportion of those enrolled by CareFirst at their District workplace live in the suburbs.

[43] *See* testimony of William L. Jews, Hearing Transcript at 53.

The gulf, then, between what GHMSI is contributing to community organizations and what Appleseed believes it could and should be contributing, is wide. CareFirst points to the $2.6 million it donated to community organizations in 2004, of which $1.3 million was donated by GHMSI directly,[44] while saying it plans to increase this amount significantly in coming years. Appleseed believes that GHMSI alone could make contributions of between $41 million and $61 million a year without damage to its financial viability or competitiveness.

Appleseed bases its estimate of the amount GHMSI could safely contribute to community organizations on the ratio of surplus to premium volume.[45] It believes that GHMSI has too much surplus and that it should divest itself of much of that surplus by donating the money to community charities. Specifically Appleseed believes that GHMSI should make community contributions equal to 2% ($41 million) to 3% ($61 million) of its *premium volume*, using 2003 figures.

GHMSI testified that while it is currently in good financial health, with an A+ rating from the financial rating organizations,[46] that was not always the case. In the late 1980s, GHMSI was close to bankruptcy. Currently it has a ratio of capital (reserves and surplus) to risk of 950%. Testimony presented on behalf of GHMSI defended that ratio as approximately correct, given competitive pressures and the uncertainties of the

---

[44] The Department believes that $537,000 of that amount represents expenditures from the Rate Stabilization Fund.
[45] *See* testimony of Dr. Deborah Chollet, Senior Fellow, Mathematica Policy Research, expert witness for Appleseed, Hearing Transcript at 178.
[46] *See* testimony of William L. Jews, Hearing Transcript at 59.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

future.[47]  That is substantially higher than the minimum ratio of 200% mandated by

District of Columbia law or the 375% minimum ratio required by the Blue Cross Blue

Shield Association of its members, but well within prudent operating standards for a

company with the size and scope of GHMSI, according to its expert.[48]  At the upper end

of the scale, the Blue Cross Blue Shield Association has established 800% as the surplus

level at which it "makes the 'presumption…that the [insurer] is sufficiently strong to

meet its obligation to its insureds well into the future.'"[49]  The Pennsylvania Insurance

Department recently held that the maximum level of surplus that that state's BlueCross

BlueShield plans should maintain varied between 750% and 950%.[50]  Finally, in an

analysis commissioned by GHMSI, the Milliman Group concluded that "a reasonable

target for GHMSI's surplus ratio is 800-1100%…under normal operating conditions."[51]

      The use of the term "surplus" in the insurance context is often misunderstood.  To

a layman "surplus" implies "extra;" that is, not needed.  In insurance terms, however,

"surplus" is that margin of reserves that can protect against unforeseen losses, as could

arise from an epidemic, a terrorist attack, or simply from business reverses.  According to

Robert H. Dobson, a consulting actuary with Milliman who testified on behalf of

GHMSI, "surplus" has a precise definition; it is the difference between assets and

liabilities, known in other contexts as "net worth" or "equity capital" or "contingency

---

[47] *See* testimony of Robert H. Dobson, F.S.A., Milliman Actuarial Consultants, Hearing Transcript at 93-95.
[48] *See* Appleseed Report at III-45; Robert H. Dobson et al., "Need for Statutory Surplus and Development of Optimal Surplus Target Range" ("Milliman Report"); In re Application of Capital Blue Cross et al., Penn. Ins. Dept. Misc. Docket No. MS05-02-006, at 22 (February 9, 2005) ("Penn. Ins. Dept. Order").
[49] *See* Penn. Ins. Dept. Order at 22.
[50] *See* Penn. Ins. Dept. Order at 35.  The Pennsylvania Insurance Commissioner state that "[t]he difference between the ranges is due to considerations of size and level of diversification, as well as distinctions in underwriting risk volatility and underwriting risk leverage." *Id.* at 37.
[51] *See* Milliman Report at 18.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

reserves."[52] Another witness for GHMSI, former Pennsylvania Insurance Commissioner Constance B. Foster, testified that health insurers need "a strong surplus...to meet their obligations to their policy holders."[53]

All parties agreed that surplus is necessary and also that it is possible to have more surplus than is reasonably required. But how much surplus is too much? Surplus is a measure of the health of a company, and to ask how much is necessary is essentially to ask: "How healthy should the company be?" We believe it is not wise or feasible to establish a "bright line" test for making such a determination. The testimony presented at the hearing, however, was enlightening and helpful in dealing with this question.

The Department is unpersuaded that the proper measure of the capacity of an insurance company to safely make contributions to community charities should be the ratio of surplus to *premium volume*, which is the standard proposed by Appleseed.[54] "Premium volume" is simply a reflection of the amount of business (i.e., the amount of risk assumed) by the insurance company. An insurance company could have a very large premium volume (as indeed GHMSI does) and be teetering on the brink of bankruptcy, (which fortunately GHMSI is not).[55] We believe a better measure for considering whether the amount of charitable contributions is reasonable is the relationship between surplus and *earned income* or *net operating income*. That is the measure CareFirst uses

---

[52] *See* testimony of Robert H. Dobson, Hearing Transcript at 93.
[53] *See* testimony of Constance B. Foster, former Insurance Commissioner of Pennsylvania and now a partner with Saul Ewing LLP. Hearing Transcript at 79.
[54] *See* testimony of Dr. Deborah Chollet, senior fellow at Mathematica Policy Research, Hearing Transcript at 178. *See* also criticism of Dr. Chollet's methodology, testimony of Dr. Gregory S. Vistnes, Charles River Associates, a witness for GHMSI, Hearing Transcript at 102-111.
[55] *See* colloquy on this subject between Commissioner Mirel and Dr. Chollet, Hearing Transcript at 179-180.

when it says its community charitable program was 2% of earned income in 2004 and will rise to 7.3% of earned income in 2005.[56]

We find that the $41 million to $61 million that Appleseed asserts GHMSI could safely divest itself of, based on its current premium volume, is not reasonable, and we reject the use of a surplus-to-premium-volume measure as unsound and potentially dangerous.

At the same time we believe that the ability of CareFirst and of GHMSI to do more for the community than it is doing currently is beyond doubt.

In 2003, CareFirst had revenues of $7.3 billion and net income of $171.3 million.[57] Furthermore, GHMSI has total adjusted capital levels that are generally well above industry standards and above the levels of other providers in the District and Maryland.[58]

Based on its financial health, including its significant surplus and net income level, and the breadth of its operations in the District, we believe that GHMSI should be engaging in charitable activity significantly beyond its current activities.

By finding that GHMSI should engage in significant additional charitable activity, the Department does not mean to diminish the importance of GHMSI's and CareFirst's current charitable activities. Moreover, by finding that GHMSI can and should engage in significant additional charitable activity, the Department also does not mean to diminish the importance of maintaining a large level of surplus.

---

[56] *See* testimony of William L. Jews, Hearing Transcript at 53.
[57] CareFirst 2003 Annual Report at 11.
[58] *See* Appleseed Report at III-42 through III-46; Appleseed Supplemental Report at 14-15. According to Appleseed, GHMSI's surplus was 951% of authorized control level risk-based capital.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

A major responsibility of the Department is to ensure that the company that collects premiums from its policyholders today will be around and able to pay legitimate claims that may be filed by those policyholders in the future.   We expect—indeed we require—that insurance companies maintain sufficient surplus to be able to assure us that they can meet their commitments to their policyholders.  We do not want to see a situation where at the very time when an unforeseen event causes substantial losses, such as would happen in the event of an Asian flu epidemic or another anthrax attack, our major health insurer is unable to pay claims because it has insufficient surplus. Furthermore we recognize that in the current health insurance market even our largest insurer, CareFirst/GHMSI, is a small player on the national scene and will be under increasing pressure from much larger for-profit insurers with access to the capital markets that are not available to a non-profit, and that because of these competitive factors it is prudent for CareFirst/GHMSI to have the resources needed to constantly modernize and up-grade to meet the competition.   We agree with CareFirst/GHMSI that its major obligation is to its policyholders.

The importance of maintaining a significant level of surplus is highlighted by GHMSI's relatively recent history.  Just over a decade ago, GHMSI was in such poor financial condition that it needed to borrow $60 million from other BlueCross/Blue Shield plans in order to remain solvent.[59]  It is the responsibility of the GHMSI Board of Trustees—and of this Department — to ensure that this type of situation does not occur again.

---

[59] *See* testimony of Robert M. Willis, member of the Board of Trustees of GHMSI, Hearing Transcript at 19.

Report of the District of Columbia Department of Insurance, Securities, and Banking
*Lawrence H. Mirel, Commissioner*
May 15, 2005

The Department believes that it is possible for a non-profit insurer to maintain too large a surplus. In fact, even the actuarial consultant for GHMSI acknowledged this point at the Department's hearing.[60] There is not sufficient evidence before the Department, however, for us to establish a maximum level of surplus. Moreover, the Department finds that it is the responsibility of the Board (in the first instance) to determine this level, and therefore the additional amount of community charitable activity that GHMSI can safely engage in.[61]

Based on the evidence before the Department, it appears that GHMSI may reduce its surplus level without negatively impacting its financial strength and viability, and the Department believes that could be achieved by increasing financial contributions to organizations, activities, or joint efforts that will advance the public health in the District of Columbia.

CareFirst may already be recognizing its responsibility. Earlier this year, CareFirst announced a multiyear $92 million "CareFirst Commitment" initiative that is "designed to further [CareFirst's] mission of maximizing access to and the affordability of health care coverage, while at the same time facilitating [CareFirst's] social commitments to the communities we serve."[62] The result of the initiative will be to

---

[60] *See* testimony of Robert H. Dobson, Hearing Transcript at 98 ("There is an actuarial principle...that states that it's not reasonable nor prudent, nor even possible, to set aside enough money to prepare for any conceivable contingency. So I guess that, by itself, acknowledges that there is some amount [of surplus] which would not be considered reasonable.")

[61] Many witnesses agreed on this point. *See*, for example, testimony of Walter Smith, executive director of Apleseed, Hearing Transcript at 143. ("[T]he GHMSI board should determine in the first instance and exercise its discretion in the first instance...to decide how much they can afford ...to spend and what the programs will be..."). *See also* testimony of Frances Gemmill, president of the D.C. League of Women Voters, Hearing Transcript at 236. ("I think the CareFirst board has to decide" how additional charitable contributions are spent.)

[62] Written testimony of Carol Keehan, Member, GHMSI Board of Trustees, at 2.

reduce the growth in surplus, both directly and indirectly. The initiative is comprised of a commitment to lower CareFirst's earnings (i.e. its growth in "surplus") target by $60 million; $24 million "to fund public-private programs that provide prescription drugs for low-income seniors in Maryland and to offer coverage for difficult-to-insure individuals in the District of Columbia"; and $8.7 million in 2005 "to launch new initiatives to encourage excellent physician care, improve patient safety, enhance hospital intensive care, partner with community organizations to address health care needs, and reduce racial and ethnic health disparities."[63]

## V. CONCLUSION

The Department finds that although GHMSI may meet its legal obligation to engage in charitable activity solely through the provision of health insurance in its service area, GHMSI has an additional responsibility — separate and apart from the bare legal obligation set forth in its charter — to engage in charitable activities in the District of Columbia which advance the public health. The Department believes that it is possible for GHMSI to make these additional charitable contributions while maintaining a financially strong health insurance program for its subscribers, but declines to determine the amount or kinds of additional community contributions GHMSI should make. The Department finds that it is the responsibility of the Board of Trustees (in the first instance) to determine the amount of additional charitable contributions which will be made, and the manner in which the contributions will be made.

---

[63] CareFirst News Release, "CareFirst BlueCross BlueShield Announces $92 Million Plan to Fulfill Not-for-Profit Mission", January 18, 2005. Of the $35 million in rate relief, GHMSI stated that "$10.5 million [is] in the District itself;" written testimony of William L. Jews, at 8.

**Report of the District of Columbia Department of Insurance, Securities, and Banking**
*Lawrence H. Mirel, Commissioner*
May 15, 2005

The Commissioner requests that the Board of Trustees of GHMSI submit to the Department a detailed report by September 1, 2005, reporting on the charitable activities of both GHMSI and CareFirst for 2004 and 2005, and the planned activities of GHMSI and CareFirst for 2006 and beyond.  The report should include a location-specific listing of the organizational recipients of charitable contributions and an analysis of the expected benefits of the charitable activities and contributions of GHMSI and CareFirst.

EXHIBIT 2

1412               PUBLIC LAWS—CHS. 696–698—AUG. 11, 1939         [53 STAT.

*Maintenance in separate fund of designated sums transferred; uses.*

SEC. 2. (a) From the fund authorized to be transferred by section 1 hereof, the Secretary of Agriculture is authorized to transfer to the Secretary of the Interior sums as follows to be maintained in a separate fund, $75,000, which shall be used by the Secretary of the Interior to promote the free flow of domestically produced fishery products in commerce by conducting a fishery educational service; and $100,000, which shall be used by the Secretary of the Interior to develop and increase markets for fishery products of domestic origin.

Approved, August 11, 1939.

[CHAPTER 697]

AN ACT

To authorize the addition of certain lands to the Wenatchee National Forest.

*August 11, 1939*
*[H. R. 5747]*
*[Public, No. 394]*

*Wenatchee National Forest, Wash. Addition of certain lands authorized.*

*42 Stat. 465; 43 Stat. 1090.*
*16 U. S. C. §§ 485, 486.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any of the following-described lands which are found by the Secretary of Agriculture to be chiefly valuable for national-forest purposes may be exchanged under the provisions of the Act entitled "An Act to consolidate national forest lands", approved March 20, 1922, as amended, and upon acceptance of title therefor shall become parts of the Wenatchee National Forest: Township 25 north, range 21 east, Willamette meridian, section 5; section 6, north half. Township 26 north, range 21 east, Willamette meridian, sections 1 to 8, inclusive; section 17, west half; sections 18 and 19; section 20, west half; section 29, west half; sections 30 and 31. Township 27 north, range 21 east, Willamette meridian, sections 19 to 36, inclusive.

*Inclusion of public lands.*

*Prior rights not affected.*

*Mineral locations, etc.*

SEC. 2. All public lands within the areas described in section 1 are hereby added to the Wenatchee National Forest and shall hereafter become subject to all laws and regulations applicable to national forests. The addition of such lands shall not affect any entry or vested right under the public land laws initiated prior to the passage of this Act. Lands received in exchange or purchased under the provisions of this Act shall be open to mineral locations, mineral development, and patent, in accordance with the mining laws of the United States.

Approved, August 11, 1939.

[CHAPTER 698]

AN ACT

Providing for the incorporation of certain persons as Group Hospitalization, Inc.

*August 11, 1939*
*[H. R. 6209]*
*[Public, No. 395]*

*Group Hospitalization, Inc. Incorporators.*

*Corporate name.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Arthur C. Christie, doctor of medicine; Major General Charles R. Reynolds; Mrs. Joshua Evans, Junior; Joseph H. Himes; General Frank T. Hines; Frank R. Jelleff; Howard W. Kacy; Mark Lansburgh; Admiral Ross T. McIntire; George H. O'Connor; Sidney F. Taliaferro; Charles S. White, doctor of medicine; Roger J. Whiteford; Thomas W. Brahany; and E. Barrett Prettyman, and their successors to be selected in the manner hereinafter declared, be, and they hereby are, incorporated and made a body politic and corporate, by the name of "Group Hospitalization, Inc.", and by that name may contract and be contracted with, sue and be sued, plead and be impleaded in any court of law or equity of competent jurisdiction, and may have and use a common seal.

Sec. 2. Said corporation is hereby authorized and empowered (a) to enter into contracts with individuals or groups of individuals to provide for hospitalization of such individuals, upon payment of specified rates or premiums, and to issue to such individuals appropriate certificates evidencing such contracts; (b) to enter into contracts with hospitals for the care and treatment of such individuals, in accordance with the terms of such certificates; and (c) to cooperate, consolidate, or contract with groups or organizations interested in promoting and safeguarding the public health.

*Powers.*

Sec. 3. Said corporation shall not be conducted for profit, but shall be conducted for the benefit of the aforesaid certificate holders. The business and affairs of this corporation shall be conducted by its board of trustees, who shall have full power and authority in the premises, including authority to provide for all expenses incident to the conduct and management of its business and affairs. The number of trustees shall be fixed by the bylaws, but shall be at least fifteen, and shall be maintained so as to be divisible into three equal classes. The incorporators are hereby declared to be the first board of trustees of this corporation, and their respective terms of office shall be as follows: General Frank T. Hines, Sidney F. Taliaferro, and Frank R. Jelleff, five years; Howard W. Kacy, Admiral Ross T. McIntire, and Arthur C. Christie, four years; Major General Charles R. Reynolds, Joseph H. Himes, and Charles S. White, three years; Mrs. Joshua Evans, Junior, Mark Lansburgh, and George H. O'Connor, two years; Roger J. Whiteford, Thomas W. Brahany, and E. Barrett Prettyman, one year. Upon the expiration of the respective terms of said trustees, their successors shall be appointed as follows: One by the Commissioners of the District of Columbia, one by the Medical Society of the District of Columbia, and one by a group consisting of the president or chairman of the boards of trustees or other designated individual of each hospital with which the corporation shall have contracts for hospitalization, at a meeting called thirty days in advance by the president of Group Hospitalization, Inc. If either of the other two groups aforesaid shall fail to name their respective quotas of trustees at any time, then such trustees shall be selected by the Commissioners of the District of Columbia. If the number of trustees shall be increased, each of the appointing authorities heretofore designated shall increase, proportionately, the number of trustees to be appointed by such appointing authority. Each of the trustees to be appointed as aforesaid shall serve for five years.

*Nonprofit business, conducted for benefit of certificate holders.*

*Trustees.*

*Incorporators declared first board of trustees; terms of office.*

*Appointment of successors.*

Sec. 4. The first board of trustees shall meet within ten days after the approval of this Act and elect a president, vice president, secretary and treasurer, and from time to time such additional officers as the bylaws may provide, and also transact such other business as may properly come before them, including the preparation for approval, from time to time, of the necessary bylaws for the proper conduct of the corporation. The treasurer shall give bond to the corporation with sufficient surety, in such penalty as the trustees determine, for the faithful discharge of his duty. Thereafter the meetings of the trustees shall be held at such time and place as provided in the bylaws. In case of vacancy in the board of trustees caused otherwise than by expiration of term of office, such vacancy shall be filled by the remaining trustees for the unexpired term of such former trustee.

*Meetings, officers, etc.*

Sec. 5. The corporation shall file with the superintendent of insurance of the District of Columbia a certified copy of this charter, of its bylaws, and copies of the forms of contracts to be offered to the certificate holders, whereupon the company may commence operations under this charter. The corporation shall also file annually with said superintendent of insurance a statement disclosing the operations of

*Certified copy of charter to be filed with superintendent of insurance, D. C.*

*Report.*

Improper conduct.

the corporation for the preceding year, and its financial position.  If said superintendent shall have reason to believe that this corporation is not complying with the provisions of this charter, or is being operated for profit, or fraudulently conducted, he shall cause to be instituted the necessary proceedings to enjoin such improper conduct, or to dissolve this corporation.

Investments.

Sec. 6. The funds of this company may be invested only in securities in which the funds of insurance companies may be invested, as provided by the laws of the District of Columbia.

Application of D. C. laws.

Sec. 7. This corporation shall not be subject to the provisions of statutes regulating the business of insurance in the District of Columbia, but shall be exempt therefrom unless specifically designated therein.

Purposes declared; property tax-exempt; exemption.

Sec. 8. This corporation is hereby declared to be a charitable and benevolent institution, and all of its funds and property shall be exempt from taxation other than taxes on real estate.

Corporate authority.

Sec. 9. The corporation is hereby authorized and empowered to take over, carry out, and assume all contracts, obligations, assets, and liabilities of a corporation heretofore organized and now doing business in the District of Columbia under the name of Group Hospitalization, Inc.

Right to amend or repeal reserved.

Sec. 10. This Act may be altered, amended, or repealed at the pleasure of the Congress of the United States of America.

Approved, August 11, 1939.

[CHAPTER 699]

## AN ACT

August 11, 1939
[H. R. 6634]
[Public, No. 396]

Amending previous flood-control Acts, and authorizing certain preliminary examinations and surveys for flood control, and for other purposes.

Flood control.
50 Stat. 877.
33 U. S. C., Supp. IV, § 701g.
Removal of debris, etc.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2 of the Flood Control Act of August 28, 1937, is hereby amended to read as follows:

"That the Secretary of War is hereby authorized to allot not to exceed $300,000 from any appropriations heretofore or hereafter made for any one fiscal year for flood control, for removing accumulated snags and other debris and clearing channels in navigable streams and tributaries thereof when in the opinion of the Chief of Engineers such work is advisable in the interest of flood control: *Provided,* That not more than $25,000 shall be allotted for this purpose for any single tributary from the appropriations for any one fiscal year."

Proviso.
Restriction.

Funds made available for surveys, preparing reports, etc.

Sec. 2. Funds heretofore or hereafter appropriated for construction and maintenance of flood-control works by the War Department shall be available for expenditure by the War Department in making examinations and surveys for flood control heretofore or hereafter authorized, or in preparing reports in review thereof as authorized by law, in addition to funds heretofore authorized to be expended for such purposes by the War Department.

52 Stat. 804.
33 U. S. C., Supp. IV, § 558b.
Exchange of land or other property.
Buffalo Bayou and tributaries, Tex.
52 Stat. 802.

Sec. 3. That section 2 of the River and Harbor Act of June 20, 1938, is hereby made applicable to authorized works of flood control.

Sec. 3a. Buffalo Bayou and its tributaries, Texas; the project set forth in House Document Numbered 456, Seventy-fifth Congress, and authorized by Public Law Numbered 685, Seventy-fifth Congress, is hereby modified in accordance with the provisions of section 2 of Public Law Numbered 761, Seventy-fifth Congress, and all requirements of local cooperation inconsistent with said section 2 are hereby eliminated.

52 Stat. 1215.
33 U. S. C., Supp. IV, § 701c (note).
Ohio River Basin.
52 Stat. 1217.

Sec. 4. The flood-control plan for the Ohio River Basin authorized in section 4 of the Act of Congress June 28, 1938 (Public, Numbered

EXHIBIT 3

ACT OF AUGUST 11, 1939,
CH. 698, 53 STAT. 1412

as amended by

ACT OF OCTOBER 17, 1984,
PUB. L. NO. 98-493, 98 STAT. 2272,

ACT OF OCTOBER 5, 1992,
PUB. L. NO. 102-382, § 137, 106 STAT. 1442.

ACT OF OCTOBER 29, 1993,
PUB. L. NO. 103-127, § 138, 107 STAT. 1336

and

ACT OF DECEMBER 16, 1997,
PUB. L. NO. 105-149, 111 STAT. 2684

# GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.

## CHARTER

Certification of Charter
Group Hospitalization and Medical Services, Inc.

I hereby certify that the document attached hereto, consisting of two pages and providing for the incorporation of certain persons as Group Hospitalization and Medical Services, Inc. is a true and accurate copy of the Charter issued to Group Hospitalization and Medical Services, Inc. pursuant to an Act of Congress, approved August 11, 1939, as amended October 17, 1984, October 5, 1992, October 29, 1993 and December 16, 1997, by acts of Congress. There are no further amendments to this Charter.

Date: 1/9/98

By [signature]
J. E. Wenig
Secretary
Group Hospitalization and
Medical Services, Inc.

# AN ACT

*Providing for the incorporation of certain persons as Group Hospitalization and Medical Services, Inc.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Arthur C. Christie, doctor of medicine, Major General Charles R. Reynolds; Mrs. Joshua Evans, Junior; Joseph H. Himes; General Frank T. Hines; Frank R. Jelleff; Howard W. Kacy; Mark Lansburgh; Admiral Ross T. McIntire; George H. O'Connor; Sidney F. Taliaferro; Charles S. White, doctor of medicine; Roger I. Whiteford; Thomas W. Brahany; and E. Barrett Prettyman, and their successors to be selected in the manner hereinafter declared, be, and they hereby are, incorporated and made a body public and corporate, by the name of "Group Hospitalization and Medical, Inc.", and by that name may contract and be contracted with, sue and be sued, plead and be impleaded in any court of law or equity of competent jurisdiction, and may have and use a common seal. The District of Columbia shall be the legal domicile of the corporation.

SEC. 2. Said corporation is hereby authorized and empowered (a) to enter into contracts with individuals or groups of individuals to provide for hospitalization and medical care of such individuals, upon payment of specified rates or premiums, and to issue to such individuals appropriate certificates evidencing such contracts; (b) to enter into contracts with hospitals and other providers for the care and treatment of such individuals, in accordance with the terms of such certificates; (c) to cooperate, consolidate, or contract with individuals, groups, or organizations interested in promoting and safeguarding the public health; and (d) to engage in any lawful business that is incidental to or supportive of the business and affairs of this corporation.

SEC. 3. Said corporation shall not be conducted for profit, but shall be conducted for the benefit of the aforesaid certificate holders. The business and affairs of this corporation shall be conducted by its board of trustees, who shall have full power and authority in the premises, including authority to provide for all expenses incident to the conduct and management of its business and affairs. The number of trustees, their terms of office, and the manner in which they may be elected shall be fixed by the bylaws.

SEC. 4. The first board of trustees shall meet within ten days after the approval of this Act and elect a president, vice president, secretary and treasurer, and from time to time such additional officers as the bylaws may provide, and also transact such other business as may properly come before them, including the preparation for approval, from time to time, of the necessary bylaws for the proper

conduct of the corporation. The treasurer shall give bond to the corporation with sufficient surety, in such penalty as the trustees determine, for the faithful discharge of his duty. Thereafter the meetings of the trustees shall be held at such time and place as provided in the bylaws. In case of vacancy in the board of trustees caused otherwise than by expiration of term of office, such vacancy shall be filled by the remaining trustees for the unexpired term of such former trustee.

SEC. 5. The corporation shall be licensed and regulated by the District of Columbia in accordance with the laws and regulations of the District of Columbia.

SEC. 6. The funds of this company may be invested only in securities in which the funds of insurance companies may be invested, as provided by the laws of the District of Columbia.

SEC. 7. The corporation shall reimburse the District of Columbia for the costs of insurance regulation (including financial and market conduct examinations) of the corporation and its affiliates and subsidiaries by the District of Columbia.

SEC. 8. This corporation is hereby declared to be a charitable and benevolent institution, and all of its funds and property shall be exempt from taxation other than taxes on real estate and unemployment compensation

SEC. 9. The corporation is hereby authorized and empowered to take over, carry out, and assume all contracts, obligations, assets, and liabilities of a corporation heretofore organized and now doing business in the District of Columbia under the name of Group Hospitalization, Inc.

SEC. 10. The corporation may have 1 class of members, consisting of at least 1 member and not more than 30 members, as determined appropriate by the board of trustees. The bylaws for the corporation shall prescribe the designation of such class as well as the rights, privileges and qualifications of such class, which may include, but shall not be limited to — (1) the manner of election, appointment or removal of a member of the corporation; (2) matters on which a member of the corporation has the right to vote; and (3) meeting, notice, quorum, voting and proxy requirements and procedures. If a member of the corporation is a corporation, such member shall be a nonprofit corporation.

SEC. 11. This Act may be altered, amended, or repealed at the pleasure of the Congress of the United States of America. The corporation may not be dissolved without approval by Congress.

Approved August 11, 1939, amended October 17, 1961, October 5, 1993, October 29, 1993, and December 16, 1997.

EXHIBIT 4

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
OFFICE OF THE ATTORNEY GENERAL



ATTORNEY GENERAL

[Privileged Attorney-Client Communication]

## MEMORANDUM

TO:        **Robert Bobb**
           **City Administrator**

FROM:      **Robert J. Spagnoletti**
           **Attorney General**

DATE:      **March 4, 2005**

SUBJECT:   **CareFirst – evaluation of DC Appleseed's contentions regarding
           GHMSI's charitable obligation**

---

This memorandum responds to your request for an evaluation of the DC Appleseed Center
for Law and Justice's ("DC Appleseed") legal contentions regarding the "charitable
obligation" of Group Hospitalization and Medical Services, Inc. ("GHMSI"), the
congressionally-chartered, District of Columbia ("District") affiliate of CareFirst Blue Cross
and Blue Shield ("CareFirst"). DC Appleseed's legal contentions are set forth in Section 2 of
its December 2004 report on "CareFirst: Meeting Its Charitable Obligation to Citizens of the
National Capital Area" (hereinafter "Appleseed Report"). Section 2 was prepared by the law
firm of Covington & Burling and is entitled "GHMSI's Legal Obligation to Pursue a
Charitable, Public Health Mission."

DC Appleseed is correct in concluding that GHMSI, which was chartered by Congress as a
"charitable and benevolent institution," has an obligation to pursue a public health mission
and that this obligation is not inconsistent with GHMSI's obligation, also under its charter, to
operate for the benefit of its subscribers. DC Appleseed also correctly concludes that
GHMSI's responsibilities with respect to its public health mission are subject to (1)
regulatory oversight by the Department of Insurance, Securities and Banking and (2) the
Attorney General's enforcement authority under common law.

As DC Appleseed notes, the D.C. Council has recognized in a statutory finding that the
Attorney General "is entrusted by common law to bring actions on behalf of the public in the
event of a breach of the charitable trust of a healthcare entity." D.C. Code § 44-601(5).
Because GHMSI is domiciled in the District, operates in the District, and is licensed and
regulated by the District government, the Attorney General for the District of Columbia is the
official who would represent the interest of the community in a court proceeding to
determine whether GHMSI has acted contrary to its charter obligations. *See* Restatement
(Second) Trusts § 391 comment *a*.

---

John A. Wilson Building, 1350 Pennsylvania Avenue, NW, Suite 409, Washington, DC 20004  Phone (202) 727-3400 Fax (202) 724-6590

R. Bobb Memorandum
March 4, 2005
Page 2 of 8

DC Appleseed's analysis of GHMSI's operations has properly focused on whether the company has been using its financial resources consistently with its charitable mission. However, in characterizing GHMSI as "not yet devoting [its] considerable assets to charitable activities" (Appleseed Report at I-4), DC Appleseed uses the term "charitable" in a very narrow sense and fails to recognize that GHMSI can be faithful to its "charitable and benevolent" designation by operating its non-profit health plans for the purpose of promoting better public health. Indeed, by providing or improving non-profit health plan benefits for as many subscribers as possible, GHMSI can do much to promote better health in its service area. GHMSI may even choose to fulfill its "charitable" mission by devoting *all* of its resources – including profits and excess surplus – to maximizing the quality, benefits, affordability, and accessibility of its health plans, while maintaining fiscal soundness. Alternatively, GHMSI may choose to allocate some of its resources to providing health-related services at no charge or to funding other organizations or entities that are working to promote public health.

GHMSI must operate as a charitable and benevolent institution, consistent with operating for the benefit of its present and future subscribers. It cannot fulfill this mission simply by allocating a specified percentage of premiums or earnings to distinctly "charitable" activities. Rather, GHMSI is to devote its entire operation to serving, directly or indirectly, the purposes for which it was chartered. It is largely up to GHMSI's board to decide how GHMSI will serve these purposes, including the extent, if any, to which profits or surplus are to be devoted to public-health-related activities other than the operation of non-profit health plans for paying subscribers.

This memorandum focuses on the legal standards that should guide District of Columbia Government ("District") officials in determining how GHMSI may fulfill its corporate purpose as a "charitable and benevolent" institution. It does not address whether GHMSI has in fact been operating consistently with its charter.

1.    **GHMSI may fulfill its obligation to act as a "charitable and benevolent institution" by providing non-profit health plan services to paying subscribers.**

GHMSI may meet its obligations under its charter through the operation of non-profit health plans, even if the only direct beneficiaries are the plans' past, current, and future paying subscribers. To the extent that GHMSI's health plans are being operated for "charitable and benevolent" purposes, the profits they generate need not be diverted to other activities. Instead, GHMSI may seek to promote better public health by using its profits exclusively to enhance the quality, benefits, affordability, or accessibility of its health plans.

In the District of Columbia, a charitable corporation like GHMSI is ordinarily subject to the principles and rules that apply to charitable trusts, as described by the Restatement (Second) Trusts (1959). *Bd. of Dirs. of the Washington City Orphan Asylum v. Bd. of Trs. of the Washington City Orphan Asylum*, 798 A.2d 1068, 1075-76 & nn. 5-6 (D.C. 2002); *see Hooker v. Edes Home*, 579 A.2d 608, 611 n.8 (D.C. 1990) (applying Restatement to

R. Bobb Memorandum
March 4, 2005
Page 3 of 8

charitable corporation chartered by Act of Congress). Under these common law principles, charitable purposes are those that "are of a character sufficiently beneficial to the community to justify permitting property to be devoted forever to their accomplishment." Restatement (Second) Trusts § 374. A long-recognized charitable purpose is "the promotion of health." *Id.* §§ 368(d), 372. Therefore, GHMSI may act as a "charitable and benevolent" institution by making the promotion of health the bottom-line purpose of its health plan operations.

An institution that promotes health may be "charitable" even if, like GHMSI, it requires subscribers to "pay fees or otherwise contribute to the expense of maintaining the institution," so long as "the income so derived is to be used only to maintain the institution or for some other charitable purpose." *Id.* § 376 comment *c*. If the fees generate profits, the profits may "be used for *the purposes of the undertaking producing the profits* or for other charitable purposes." *Id.* § 376 comment *d* (emphasis supplied). In other words, as long as the institution is devoted to charitable purposes and the generation of profits is at most a means to those ends, the institution is under no obligation to devote its profits to an activity that is independent of the charitable activities that produced the profits.

Assuming that its purpose is to promote health, a non-profit health plan may qualify as charitable if "the persons who are to benefit are . . . of a sufficiently large or indefinite class so that the community is interested in the enforcement" of the obligation to serve. *Id.* § 375. The test is whether the benefit can be said to extend beyond the direct beneficiaries to the community itself:

> A trust for the promotion of health is charitable whether it extends to all persons, or is limited to those residing in a particular district, or those of a particular class, provided that the class is not so small that the relief of the class is not of benefit to the community. Thus, a trust to establish or maintain a hospital for the employees of a particular railroad is charitable.

*Id.* § 372 comment *a*.

More important to the analysis than the actual number of beneficiaries is the size of the group from which they are drawn:

> A trust may be a charitable trust although the number of persons who receive a benefit from it is small, provided that the class from which they are to be selected is sufficiently large. Thus, a trust to apply the principal for the benefit of a small number of poor persons, or a trust to apply the principal in defraying the expenses of the education of one poor boy, or a trust to apply the principal as a prize for the best work of art produced within five years after the settlor's death, is a charitable trust. In each case the class of persons from whom the recipients of the benefit are to be drawn is sufficiently wide to make the trust charitable, although the number of persons to receive the benefit is strictly limited.

R. Bobb Memorandum
March 4, 2005
Page 4 of 8

Id. § 375 comment *j*. According to the most current authority, one looks beyond the actual number of direct beneficiaries to consider whether the beneficiaries are "drawn from an indefinite group" or "from a group so narrowly defined (e.g., the settlor's descendants or relatives) as to make the trust a private trust." Restatement (Third) Trusts § 28 comment *a(1)*.

With hundreds of thousands of paying subscribers and the potential to enroll hundreds of thousands more, GHMSI can have a broad and positive impact on the public health if it conducts itself for the benefit of its subscribers, as its charter requires. Moreover, the fact that the group of GHMSI subscribers is ever-changing and drawn from a broad segment of the region's population increases the potential for the community as a whole to benefit from these activities.

DC Appleseed argues that, because GHMSI's assets are held for the benefit of the public, GHMSI has an obligation to benefit the public in some way that is independent of the benefits being conferred on current subscribers. It is true that, under both District and common law, GHMSI's assets belong to the public. As a result, GHMSI may neither liquidate its assets and distribute the proceeds to its current subscribers, nor engage in the functional equivalent of an asset liquidation by providing an extraordinarily high level of benefits to current subscribers without regard for the corporation's ability to survive over the long run. But as long as GHMSI does not sacrifice its ability to serve future subscribers, its service to current subscribers may satisfy, at least for now, its obligation to serve the public: "While the human beings who are to obtain advantages from charitable trusts may be referred to as beneficiaries, the real beneficiary is the public and the human beings involved are merely the instrumentalities from whom the benefits flow." Restatement (Third) Trusts § 28, Reporters Notes on comment *a*, *quoting In re Estate of Freshour*, 345 P.2d 689, 695 (Kan. 1959).

In further support of its argument that GHMSI has a "current, charitable" obligation to "use its assets for the benefit of the public beyond its current policyholders," DC Appleseed notes that GHMSI has a statutory obligation, as a condition to its issuing subscriber contracts in D.C., to "provide health-related educational support for residents of the corporation's service area." D.C. Code § 31-3514(i). But the statute's imposition of an educational support obligation, as a condition of GHMSI's operating in D.C., does not serve to define or expand GHMSI's charitable *purposes*, which are determined by its congressional charter. The statutory obligation is just one more regulatory constraint under which GHMSI must operate. Moreover, unlike a for-profit company, GHMSI *exists* to serve the public. It does not "satisfy" its obligation to the public simply by meeting a statute's minimum threshold for good corporate citizenship.

Seeking "to derive a community benefit test that relies on a variety of concrete indicia to serve as a standard for assessing whether GHMSI is meeting its obligations as a charitable institution" (Appleseed Report at II-27), DC Appleseed cites to various federal and state court decisions that considered whether particular institutions qualified for the tax exemptions or public asset protections normally accorded to charitable organizations. But

R. Bobb Memorandum
March 4, 2005
Page 5 of 8

these decisions provide little guidance for determining whether an *admittedly* charitable institution is acting consistently with or contrary to its own corporate purposes.

The cited cases stand for the general proposition that a non-profit organization whose only service is the provision of health insurance for paying subscribers is not *necessarily* "charitable" enough to be recognized as a charity, or at least not for all purposes. *E.g., Blue Cross and Blue Shield of Kansas City, Inc. v. Nixon*, 26 S.W.3d 218 (Mo. Ct. App. 2000) (non-profit corporation that had "increasingly articulated . . . a purpose to serve the public in a benevolent and charitable capacity" held to be "public benefit corporation"); *Supervisor of Assessments v. Group Health Ass'n, Inc.*, 517 A.2d 1076 (Md. 1986) (non-profit HMO not "charitable organization" for purposes of property tax exemption); *Harvard Community Health Plan, Inc. v. Board of Assessors*, 427 N.E.2d 1159 (Mass. 1981) (health plan that provided "lower than average cost" services to "a large number of persons . . . in the greater Boston area" deemed "charitable"); *Illinois Hospital & Health Service, Inc. v. Aurand*, 373 N.E.2d 1021 (Ill. App. Ct. 1978) (Illinois Constitution did not allow "charitable" tax exemption to be applied to property of non-profit health service corporation).

Contrary to the thrust of DC Appleseed's argument, the fact that organizations similar to GHMSI have often failed to qualify for various tax exemptions does not mean that these organizations – or GHMSI – have an *obligation* to conduct themselves in a manner that would qualify for such tax exemptions. In *Illinois Hospital & Health Service*, the court held that though a health services plan was declared by statute to be "a charitable and benevolent corporation," its property was "not used for charitable purposes within the meaning of . . . the Illinois Constitution and is therefore not entitled to exemption from tax." 373 N.E.2d at 1022-23, 1026. The court's conclusion was that the corporation, "laudable and desirable as it may be, is for the benefit of those members who make their payments," and that the corporation had not met "the burden of proving the right to [a tax] exemption." *Id.* at 1025. However, the court never suggested that this corporation had acted in any way contrary to its obligations under "the applicable statute relating to its organization." *Id.*

The apparent inconsistency between what are deemed to be charitable purposes under the common law and what are deemed to be charitable purposes under the tax laws reflects a reluctance by the courts to award tax exempt status to organizations unless they have clearly demonstrated that they "provide sufficient benefit to the community to justify exemption from . . . taxes." *Supervisor of Assessments v. Group Health Ass'n, Inc.*, 517 A.2d at 1081. In tax cases, the question before the court is not simply whether the health plan benefits the community, but whether benefit to the community is the "primary purpose" rather than "incidental to [the] function of providing health care services to its members." *Id.* at 1080. But a health plan does not have to satisfy the relatively stringent tests applied in tax cases in order to be "charitable" in the common law sense of benefiting the community *through* its service to its subscribers. Cf. Restatement (Third) Trusts § 28, Reporters Notes on comment *a, quoting* C.E. Rounds, Jr. & E.P. Hayes, Loring: A Trustee's Handbook (1997 ed.) § 9.4.1 ("A trust may not be exempt for income tax purposes, but may still be a common law charitable trust, and a trust may be exempt from income tax but not qualify as a charitable trust.").

R. Bobb Memorandum
March 4, 2005
Page 6 of 8

Significantly, none of the court decisions cited by DC Appleseed considered the *obligations* of an admittedly "charitable and benevolent" organization, like GHMSI. For example, in *Blue Cross and Blue Shield of Kansas City*, the Missouri appellate court held that a non-profit corporation that was *not* designated by statute as a "public benefit corporation" could nevertheless be deemed to be one based on its having "articulated and carried out a purpose to serve a more far-reaching constituency than just its subscribers." 26 S.W.3d at 232. The court had no need to consider, and did not consider, whether a non-profit health insurer that *has* been designated by statute as existing for the benefit of the public, such as a corporation declared to be a "charitable and benevolent institution," has any obligation to serve the public other than through the provision of services to its subscribers.

The obligations of a charitable health insurer were also not addressed in *Abbott v. Blue Cross and Blue Shield of Texas, Inc.*, 113 S.W.3d 753 (Tex. App. 2003), another case cited by DC Appleseed. *Abbott* stands for the proposition that, at least in Texas, a non-profit health insurer whose original articles of incorporation provide that "the corporation will be one of charity and benevolence," *id.* at 762, is not necessarily a "public charity" whose assets must be preserved for charitable purposes. Having found that the health insurer had "never had a public charitable purpose," *id.* at 766, the *Abbott* court did not consider the obligations placed on a health insurer that *does* have a charitable purpose.

None of the cases cited by DC Appleseed undermine the conclusions, derived from general charitable trust principles, that GHMSI may fulfill its obligations as a "charitable and benevolent institution" through the provision of health plan services to paying subscribers, and that GHMSI has no obligation to divert the profits generated by its health plan services to other charitable activities.

2.    **GHMSI's board has responsibility for determining how the corporation will fulfill its obligation to act as a "charitable and benevolent institution."**

As a "charitable and benevolent institution" whose operations are to be "conducted for the benefit of" its subscribers, GHMSI's bottom-line corporate purpose is to promote health in the community through service to its subscribers. In other words, the generation of operating profits or the enhancement of company value is at most a *means*, not an end. GHMSI has an obligation to conduct itself so as to serve the needs of subscribers in a manner that is consistent with its public health purpose. While the Attorney General has common law authority to seek judicial relief if GHMSI has neglected or acted contrary to this obligation, it is normally the responsibility of a non-profit corporation's board to determine how the corporation can best fulfill its "charitable and benevolent" mission.

Although the "business judgment rule protects the fair and honest business judgments" of GHMSI's directors as to how best to fulfill the corporation's charitable purposes, the rule does not provide any protection from judicial or regulatory interference to corporate decisions that are "contrary to those statutory purposes." *Blue Cross and Blue Shield of Missouri v. Angoff*, 1998 Mo. App. LEXIS 1490, at 51-52 (Mo. Ct. App. 1998) (state

R. Bobb Memorandum
March 4, 2005
Page 7 of 8

attorney general challenge to reorganization of non-profit health insurer). Thus, a state attorney general was able to challenge a Blue Cross organization's "decision to reorganize and its subsequent operations where the reorganization and subsequent operations effectively resulted in an abandonment of its nonprofit purposes." *Id.* at 52.

The following are examples of conduct that would appear to contravene GHMSI's charitable purposes by (1) placing profit generation or executive compensation *ahead of* GHMSI's obligation to serve its subscribers, or (2) benefiting subscribers in a manner that is inconsistent with GHMSI's obligation to promote public health:

- Seeking to increase GHMSI's profits or asset value without due regard for the effect on the quality, benefits, affordability, or accessibility of GHMSI's health plans.

- Paying GHMSI executives substantially higher compensation than is generally paid to executives at comparable non-profit institutions.

- Providing shares of GHMSI to subscribers or making a public offering of GHMSI stock.

- Using subscribers' fees to obtain substantial benefits for them, like discounts on rental cars or complimentary "frequent flyer" miles, that are unrelated to the corporation's public health mission.

- Liquidating substantial corporate assets in order to generate funds for distribution to subscribers.

Within the constraints imposed by GHMSI's charter, the decision as to how GHMSI will use its profits and excess surplus to serve the needs of its subscribers or the public is largely up to its board. The board may choose to devote the additional resources to one or more of the following goals, among others:

- Improving the overall quality or benefits of its health plans for subscribers without increasing rates.

- Increasing the overall affordability of its health plans in order to increase the number of GHMSI subscribers.

- Increasing the accessibility of its health plans for new and existing subscribers by providing discounts for subscribers with limited income.

- Providing or supporting health-related education for subscribers or the general public in GHMSI's service area.

- Engaging in cooperative efforts with private or governmental

R. Bobb Memorandum
March 4, 2005
Page 8 of 8

    institutions to promote health in GHMSI's service area.

- Supporting the efforts of other charitable organizations to promote health in GHMSI's service area.

In pursuing any of these goals, the board should keep in mind that even the "non-profit" goal of maximizing benefits for GHMSI's subscribers should be pursued in a manner that is consistent with the larger "charitable" purpose of promoting better health in GHMSI's service area. For example, by reducing its rates and thereby making its health plans more affordable, GHMSI can help to reduce the number of people in its service area who lack health insurance.

Through regular consultations with public health officials, including District officials, GHMSI and other charitable health care institutions can help to ensure that their initiatives to promote better public health represent a coordinated effort to address unmet health care needs in the GHMSI's service area.

## Conclusion

As a "charitable and benevolent institution" that seeks to serve a public health mission, GHMSI has an obligation to use its profits and excess surplus to serve the purpose of promoting health in its service area. GHMSI's board may choose to fulfill this obligation in various ways, such as devoting surplus resources to (1) improving the quality, benefits, affordability, or accessibility of its non-profit health plans, (2) providing health plan benefits or other services to the poor at no charge, and/or (3) funding health-related activities that are conducted by other charitable organizations. But GHMSI does not have an obligation -- derived either from common law principles or tax decisions – to satisfy any minimum threshold for providing services at no charge or for making contributions to other organizations.

The District, through its Attorney General, has common law authority to enforce GHMSI's obligation to operate consistently with its "charitable and benevolent" purpose. However, District officials cannot use this authority to compel GHMSI to divert funds from its own operations on behalf of its paying health plan subscribers.

District officials can actively assist efforts by GHMSI's board to ensure that the corporation is operated consistently with its charter. By helping to identify unmet health care needs in D.C., District officials can encourage GHMSI to develop initiatives that, in coordination with the efforts of other private and governmental institutions, are effective in promoting better public health in GHMSI's service area.

EXHIBIT 5

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## OFFICE OF THE ATTORNEY GENERAL



ATTORNEY GENERAL

## MEMORANDUM

**TO:**      Robert C. Bobb
             City Administrator

**FROM:**    Robert J. Spagnoletti
             Attorney General

**DATE:**    August 3, 2005

**SUBJECT:** GHMSI's charitable obligation – remaining issues after May 15, 2005
             report of Department of Insurance, Securities, and Banking

---

This memorandum responds to your request for a summary of the remaining issues with respect to the "charitable obligation" of Group Hospitalization and Medical Services, Inc. ("GHMSI"), following the issuance of the Department of Insurance, Securities, and Banking's ("DISB") May 15, 2005 report in *In the Matter of: Inquiry into the Charitable Obligations of GHMSI/CareFirst in the District of Columbia* ("DISB's report").

DISB's report correctly concludes that GHMSI has a "public health mission" and the legal authority – but not the legal obligation – "to engage in charitable activity beyond the provision of health insurance." In calling upon GHMSI to engage in such charitable activity, DISB cites the "social responsibility" that the company has "[a]s a major corporate citizen of the District of Columbia, and as the major health insurer in the District." DISB also concludes that GHMSI appears to be in a position to increase its financial contributions to public health initiatives without undermining "its financial strength and viability." (DISB's report at 10-11, 21)

The Office of the Attorney General ("OAG") has focused on GHMSI's legal obligations and takes no position with respect to the company's social responsibility to make charitable contributions to other organizations. OAG's conclusion is that GHMSI has a legal obligation to devote its entire operation to serving, directly or indirectly, the charitable, public health purposes for which it was chartered. It is possible for GHMSI to satisfy this obligation entirely through the provision of non-profit health insurance services that benefit present and future subscribers and, through them, the community as a whole. (Memo from Spagnoletti to Bobb, March 4, 2005) But the provision of non-

John A. Wilson Building, 1350 Pennsylvania Avenue, NW, Suite 409, Washington, DC 20004 Phone (202) 727-3400 Fax (202) 724-6590

R. Bobb Memorandum
August 3, 2005
Page 2 of 3

profit health insurance services is unlikely to satisfy GHMSI's obligation under its charter unless the company's bottom-line goal in providing the services is to promote public health.

Whether or not GHMSI is, in fact, operating consistently with its charitable, public health mission calls for heightened scrutiny, given the company's stated position that GHMSI's sole mission is "to operate for the benefit of its subscribers" and "not for the benefit of the public at large." ("Analysis of GHMSI's Legal Obligations under Its Federal Charter," submitted by GHMSI to DSIB, March 24, 2005) The business judgment rule gives GHMSI's board substantial discretion in determining how best to fulfill the corporation's charitable purposes. But the rule's premise is that the board recognizes and works toward those purposes. As a charitable health insurer, GHMSI's mission is to promote public health through service to its subscribers: "While the human beings who are to obtain advantages from charitable trusts may be referred to as beneficiaries, the real beneficiary is the public and the human beings involved are merely the instrumentalities from whom the benefits flow." Restatement (Third) Trusts § 28, Reporters Notes on comment *a*, *quoting In re Estate of Freshour*, 345 P.2d 689, 695 (Kan. 1959). Until GHMSI acknowledges its obligation as a "charitable and benevolent institution" to operate for the benefit of the public, one cannot presume that its corporate decisions are based on a board determination as to how best to fulfill the corporation's charitable purposes.

A determination that GHMSI is operating consistently with its chartered mission would require more than a finding that the corporation is operating non-profit, health insurance plans. It would also require a finding that GHMSI is treating the promotion of public health as its corporate mission, and treating other goals – such as generation of operating profits, enhancement of company value, accumulation of "surplus," and compensation of executives – as the *means* of advancing this mission. The relevant inquiry extends beyond what GHMSI is doing. Equally important is *why* GHMSI is doing it. Are the corporation's decisions aimed at maximizing the promotion of health or, as in the case of a for-profit insurance company, is the promotion of health merely a means toward a financial goal?

For example, the accumulation and maintenance of a surplus is essential if a charitable health insurer is to have the financial solvency necessary to fulfill its public health mission over the long term. But the insurer would be acting contrary to its charitable obligation if it made the accumulation of "surplus" an end in itself, or sought to accumulate surplus for a purpose that was not reasonably related to the company's public health mission. The stronger its current financial position and more secure its future prospects given its current surplus level, the less likely it is that the company has a *bona fide* need, consistent with its public health mission, to accumulate additional surplus. Indeed, the insurer's decision to build up asset value, at the expense of current services

R. Bobb Memorandum
August 3, 2005
Page 3 of 3

that benefit subscribers and the public, may reflect an intention to abandon its public
health mission in favor of a financial goal, such as maximizing asset value, that is only
proper for a for-profit insurance company.

The issue of whether GHMSI is adhering to its chartered purposes can probably not be
resolved without a review of internal documents – such as reports to the board of
directors and minutes of board meetings – that reveal how and for what purpose the
corporation has made particular decisions.

Common law has long recognized state attorneys general as the ultimate guardians of the
public interest in charitable organizations. Thus, the Attorney General is the District
official who would prosecute a court action to enforce a charitable corporation's charter
obligations. But the Attorney General does not now have the authority, other than by
filing a court action, to compel the production of documents and testimony that could
reveal the intent behind the corporation's conduct. Without access to compulsory process
during the investigation stage, the Attorney General may never know enough about the
corporation's actual purposes so as to justify filing an enforcement action.

Because GHMSI is an insurance company as well as a non-profit corporation, the
Insurance Commissioner has authority, pursuant to D.C. Code § 31-1403, to issue an
"examination warrant" authorizing an examination of the corporation's books and records
and an examination under oath of the corporation's employees. However, the
confidentiality provision applicable to information obtained in this manner implies that
the information will be used only "in the furtherance of any regulatory or legal action" by
the Insurance Commissioner; it is unclear whether the information could be used in a
civil enforcement action by the Attorney General. D.C. Code § 31-1404(f). One way to
resolve this dilemma would be to enact legislation, recently proposed by OAG's
Consumer and Trade Protection Section and reviewed by the Legal Counsel Division for
legal sufficiency, that would, among other things, grant the Attorney General independent
authority to subpoena documents and witnesses in the course of an investigation into
whether a nonprofit corporation is acting contrary to its nonprofit purposes.